FRANCHISE REALTY INTERSTATE CORPORATION and McDonald's Systems of California, Inc., Plaintiffs-Appellants,

v.

SAN FRANCISCO LOCAL JOINT EXECUTIVE BOARD OF CULINARY WORKERS et al., Defendants-Appellees.

No. 73–2727.

United States Court of Appeals, Ninth Circuit.

Sept. 17, 1976.

Rehearing and Rehearing In Banc Denied Nov. 2, 1976.

Maxwell M. Blecher (argued), of Blecher, Collins & Hecker, Los Angeles, Cal., for plaintiffs-appellants.

John Thomas Bowen (argued), of Davis, Cowell & Bowe, San Francisco, Cal., Michael Rubenstein (argued), San Francisco, Cal., James T. Fousekis (argued), of Steinhart, Goldberg, Feigenbaum & Lader, San Francisco, Cal., for defendants-appellees.

Before BROWNING and DUNIWAY, Circuit Judges, and MARKEY,* Chief Judge, United States Court of Customs and Patent Appeals.

* Sitting by designation.

DUNIWAY, Circuit Judge:

Plaintiffs (McDonald's), two subsidiaries of McDonald's Corporation, appeal from a judgment dismissing their first amended complaint without leave to amend, and the action (Rule 12(b)(6), F.R.Civ.P.), and from an order denying their motion, made after the judgment, for leave to file a second amended complaint (Rules 15(a) and 60(b)(6), F.R.Civ.P.). We affirm.

In the first amended complaint, McDonald's alleged that the defendants, two associations of restaurant and hotel employers and a labor union, had combined and conspired, in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, to oppose, repeatedly, baselessly and in bad faith, the granting of building permits by the San Francisco Board of Permit Appeals (Board) for the construction of McDonald's restaurants.

McDonald's first amended complaint alleges that in 1971 McDonald's, which operates two restaurants in San Francisco, applied for licenses for the operation of three more restaurants, that permits were granted by the San Francisco Department of Public Works, and that the defendants "persuaded" the San Francisco Board of Permit Appeals to overrule the issuance of the permits and to deny them.

It then continues:

17. The aforesaid combination and conspiracy has consisted of a continuing agreement and concert of action, the substantial terms of which have been and are:

(a) That each defendant would appear before the Board of Permit Appeals of the City and County of San Francisco and would oppose each and every permit granted to the Company by the San Francisco Department of Public Works;

(b) That each defendant would solicit the appearance before the Board of such of its members and others as it could secure to support its opposition to issuance of each such permit;

(c) That each defendant would threaten lack of political support to each Board member and other city officials who supported the Company.

18. The conduct described in paragraphs 16 and 17 herein was unlawful in that neither defendant was acting in good faith; instead the consistent, repeated and baseless opposition to the permits accorded the Company by the Department of Public Works was the product of a combination and conspiracy entered into with the explicit purpose of insulating restaurant operators in San Francisco from the competition of McDonald's restaurants and each such opposition was sham and frivolous in that by such opposition the defendants intended to and did no more than cover up a plan to foreclose the Company from free and unlimited access to the Department of Public Works and the Board of Permit Appeals of the City and County of San Francisco, and thereby interfere directly with the business activities and relationships of a competitor. Such opposition specifically undertook to injure and suppress the activities of a competitor who offered quality food at low prices in a family atmosphere.

19. Moreover, each defendant knew its activities to be unlawful and knew them to be a sham and frivolous in that each was well aware of the fact that the Company had intended to and did comply with all of the necessary code requirements, ordinances and regulations applicable to the conduct of its proposed restaurants and that the Board of Permit Appeals of the City and County of San Francisco had absolutely no authority, right, duty or responsibility to act as an economic board of review with the power to determine who and on what terms competition shall exist within the confines of San Francisco. Each defendant thus knew that by its plan of systematic, indiscriminate and wanton attack on the Company it was inducing, if not acting in concert with, the Board of Permit Appeals (other than its President), to subvert the constitutional function of that Board and to do no more than frustrate McDonald's restaurants as a competitive factor in the City and County of San Francisco.

Nowhere in the complaint does McDonald's tell us, specifically, how or why or even whether the defendants' alleged efforts to influence the Board have in any way impaired McDonald's ability fully to present its views to the Board. Nowhere is it alleged that McDonald's was prevented from applying for permits, or from having a hearing before the Board.

The mere reversal of the grant of the three applications, at the urging of the defendants, suggests no more than "that the plaintiffs and defendants met head-on before the Board and that plaintiffs lost," as the district court noted in its opinion. The complaint fails to adduce any specific facts to support the conclusory allegation that defendants' opposition before the Board was "sham" or "frivolous." This deficiency is hardly surprising, for we seriously doubt that any argument raised before the Board could be so characterized in view of the extremely broad standards governing the exercise of that body's discretion. Under section 3.651 of the Charter of the City and County of San Francisco, the Board would appear to have the authority to deny a permit whenever in its judgment issuance would adversely affect the "interests or property" of any person, or merely "the general public interest."[1] The absence of more definite standards suggests that the Board is as much a political as an adjudicatory body. The relatively precise legal standards in light of which certain arguments may be characterized as "frivolous" are simply absent from the rough and tumble of the political arena; almost any position, including the self-interested plea of one competitor that another should be denied a permit, may be urged before such a political body. We find it particularly hard to accept the characterization as "baseless" or "frivolous" of opposition which is entirely successful in obtaining the governmental action sought, as apparently was the case here.[2]

Be that as it may, the question before us is not whether defendants' arguments were frivolous, but, assuming that they were, whether the defendants' opposition, as alleged in the complaint, is a violation of the Sherman Act. We think not.

In *Eastern Railroad Presidents Conference v. Noerr Motor Freight*, 1961, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464, a group of railroads had hired a public relations firm to conduct a two-pronged campaign against competing truckers. One component was a lobbying effort to influence state legislators and executive officers to enact and zealously enforce legislation restricting the trucking industry. The other was a publicity campaign which, according to the truckers, was intended to destroy their general public reputation and the goodwill they had built up with their customers in order to enhance the railroads' share of the long distance freight market.

With respect to the direct lobbying effort, the Supreme Court declared categorically that

the Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature

---

1. Section 3.651 provides, in pertinent part:

 *3.651 Functions, Powers and Duties*

 . . . [A]ny person who deems that his interests or property or that the general public interest will be adversely affected as a result of operations authorized by or under any permit or license granted or issued by any department may appeal to the board of permit appeals. Such board shall hear the applicant, the permit-holder, or other interested parties, as well as the head or representative of the department issuing or refusing to issue such license or permit, or ordering the revocation of the same. After such hearing and such further investigation as the board may deem necessary, it may concur in the action of the department authorized to issue such license or permit, or, by the vote of four members, may overrule the action of such department and order that the permit or license be granted, restored or refused.

2. McDonald's might have a remedy in the California courts if the Board improperly reversed the granting of its permits. Nothing in the complaint indicates that it has attempted to obtain such a remedy. We know of no case that holds that joint action which succeeds in persuading a public body to make an erroneous decision can give rise to a cause of action under the Sherman Act.

or the executive to take particular action with respect to a law that would produce a restraint (of trade) or a monopoly. *Id.* at 136, 81 S.Ct. at 529.

The Court felt that a contrary construction of the Sherman Act would threaten the First Amendment right of petition, and curtail the flow of valuable information to the government from citizens and groups seeking to influence governmental action. *See* 365 U.S. at 137–38, 81 S.Ct. 523.

For similar reasons, the Court found that the lobbying immunity also encompassed the railroads' publicity campaign, even though the trial court had found that its sole purpose had been to inflict competitive injury and that the tactics employed had been deceptive and unethical:

> The right of the people to inform their representatives in government of their desires with respect to the passage or enforcement of laws cannot properly be made to depend upon their intent in doing so. It is neither unusual nor illegal for people to seek action on laws in the hope that they may bring an advantage to themselves and a disadvantage to their competitors. . . . Indeed, it is quite probably people with just such a hope of personal advantage who provide much of the information upon which governments must act. . . .
>
> We . . . hold that, at least insofar as the railroads' campaign was directed towards obtaining governmental action, its legality was not at all affected by any anticompetitive purpose it may have had.
>
> \* \* \* \* \* \*
>
> It is inevitable, whenever an attempt is made to influence legislation by a campaign of publicity, that an incidental effect of that campaign may be the infliction of some direct injury upon the interests of the party against whom the campaign is directed. And it seems equally inevitable that those conducting the campaign would be aware of, and possibly

even pleased by, the prospect of such injury. To hold that the knowing infliction of such injury renders the campaign itself illegal would thus be tantamount to outlawing all such campaigns. *Id.* at 139–40, 143–44, 81 S.Ct. at 530–533.

In *United Mine Workers v. Pennington,* 1965, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626, the Court reaffirmed the *Noerr* lobbying immunity and particularly emphasized the irrelevance of the petitioners' underlying motivation:

> *Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose. The Court of Appeals, however, would hold the conduct illegal depending upon proof of an illegal purpose. . . . (This holding is not) permitted by *Noerr* for the reasons stated in that case. Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act. *Id.* at 670, 85 S.Ct. at 1593.

The activities of defendants specifically alleged in the complaint before us consist entirely of attempts to lobby and petition a governmental body. Under *Noerr* and *Pennington, supra,* these activities are absolutely immune from antitrust liability.[3]

McDonald's reliance on the *Noerr* "sham exception" is misplaced. That exception does not extend to direct lobbying efforts such as those alleged here, but only to publicity campaigns, which this complaint does not allege. The following is the whole of the *Noerr* opinion's comment on the sham exception:

> There may be situations in which *a publicity campaign,* ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually *nothing more than* an attempt to inter-

---

**3.** While *Noerr* and *Pennington* involved attempts to influence legislative and executive action, it is now clear that the same principles govern efforts by citizens or groups to influ-

ence administrative and judicial proceedings. *California Motor Transport Co. v. Trucking Unlimited,* 1972, 404 U.S. 508, 510, 92 S.Ct. 609, 30 L.Ed.2d 642.

fere directly with the business relationships of a competitor and the application of the Sherman Act would be justified. But this certainly is not the case here. No one denies that the railroads were making a genuine effort to influence legislation and law enforcement practices. Indeed, if the version of the facts set forth in the truckers' complaint is fully credited, as it was by the courts below, that effort was not only genuine but also highly successful. Under these circumstances, we conclude that no attempt to interfere with business relationships in a manner proscribed by the Sherman Act is involved in this case. 365 U.S. at 144, 81 S.Ct. at 533 (emphasis added).

Even if the sham exception did apply to direct lobbying efforts, its scope is limited to situations where the defendant is not seeking official action by a governmental body, so that the activities complained of are "nothing more" than an attempt to interfere with the business relationships of a competitor. *See* Handler, *Twenty-Five Years of Antitrust,* 73 Colum.L.Rev. 415, 436. Here it is clear that defendants were seeking and obtained official action from a governmental body, denial of McDonald's permit applications by· the Board.

 Equally erroneous is the contention that the specific conduct alleged falls within a further exception to *Noerr* created by *California Motor Transport Co. v. Trucking Unlimited,* 1972, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642. In that case the Court held that a claim for relief was stated by a complaint which alleged that a group of large trucking companies had established a joint trust fund to finance indiscriminate opposition to every application for certificates of public convenience and necessity that smaller competitors filed with state and federal regulatory agencies. But the allegations which both this court and Justice Douglas' majority opinion found "more critical" (404 U.S. at 508, 92 S.Ct. 609) in that complaint—that a well financed campaign to oppose competitors' applications was widely publicized and that express threats of expensive and time-consuming opposition were communicated to the competitors—have no identifiable analogue in the complaint before us here. In its opinion, the Court said that these allegations "are too lengthy to quote" (*id.*). They are summarized in this court's opinion. *See Trucking Unlimited v. California Motor Transport · Co.,* 9 Cir., 1970, 432 F.2d 755, 757, 762. The contrast between those allegations and the allegations in this case is marked. While McDonald's alleges, as did the plaintiffs in *Trucking Unlimited,* that the purpose and effect of the defendants' opposition is "to foreclose the Company from free and unlimited access" to administrative agencies, its complaint is unlike that in *Trucking Unlimited* in that it fails to allege any means by which defendants have achieved, or plan to achieve, their alleged goal of barring McDonald's from access to the Board. There is no allegation that defendants have conducted a publicity campaign, no allegation that their efforts are jointly financed, and, most importantly, no allegation that defendants have by communicating threats sought to deter McDonald's from filing permit applications. The only facts relied on to support the otherwise wholly conclusory access-barring allegation are the appearances of defendants' members and others before the Board and the threats to withdraw political support, on three occasions. Both of these activities are clearly within the direct lobbying immunity recognized by *Noerr, Pennington* and *Trucking Unlimited* itself.[4]

4. "We conclude that it would be destructive of rights of association and of petition to hold that groups with common interests may not, without violating the antitrust laws, use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view respecting resolution of their business and economic interests *vis-à-vis* their competitors." *Trucking Unlimited, supra,* 404 U.S. at 510–11, 92 S.Ct. at 612. The qualification of this statement later in Justice Douglas' opinion, *viz.,* that the right to petition, though protected by the First Amendment, does not necessarily confer antitrust immunity on the petitioner (*id.* at 513, 92 S.Ct. 609), must be read in light of *Noerr* and *Pennington* and in light of the facts of *Trucking Unlimited* itself. So considered, we think it plain that this quali-

▮ Ordinarily the conclusory nature of plaintiffs' allegations might warrant greater indulgence, for dismissal of a complaint is normally proper under Rule 12(b)(6) only if "it appears beyond doubt that the plaintiff(s) can prove no set of facts̄ in support of (their) claim which would entitle (them) to relief." *Conley v. Gibson,* 1957, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80; *Corsican Productions v. Pitchess,* 9 Cir., 1964, 338 F.2d 441, 442. But this is not an ordinary case. The Supreme Court has recognized that the right to associate and to petition an administrative agency to take official action in the exercise of its powers is guaranteed by the First Amendment. *Trucking Unlimited, supra,* 404 U.S. at 510–11, 92 S.Ct. 609. Yet McDonald's would have us hold, in effect, that a claim for relief under the Sherman Act is stated by a mere conclusory allegation that this right is being exercised for the purpose of barring a competitor from access to the agency. We decline this invitation because to condition the right to associate and petition on the motivations of the petitioners would have a chilling effect on exercise of this fundamental First Amendment right, and such a ruling would in a practical sense render the *Trucking Unlimited* exception coextensive with the *Noerr* immunity.

Regardless of what the actual facts might be, what plaintiff interested in deterring his competitors' opposition before a governmental body would fail to recite in its complaint the conclusory "access-barring" incantation? And what competitor, knowing that its participation in administrative proceedings might result in expensive and burdensome litigation, which would drag on through the discovery stage at least, would not thereby feel pressured to

forego presenting its views to the government? Particularly in antitrust litigation, the long drawn out process of discovery can be both harassing and expensive. When this well known fact is combined with the large damages usually claimed (here at $11,100,000.00) and sometimes awarded, an action like this one can be, from the very beginning, a most potent weapon to deter the exercise of First Amendment rights.

▮ The Supreme Court has consistently recognized the sensitivity of First Amendment guarantees to the threat of harassing litigation, and has erected barriers to safeguard those guarantees. *See, e. g., Time, Inc. v. Hill,* 1967, 385 U.S. 374, 387–91, 87 S.Ct. 534, 17 L.Ed.2d 456; *New York Times Co. v. Sullivan,* 1964, 376 U.S. 254, 267–83, 84 S.Ct. 710, 11 L.Ed.2d 686; *N.A.A.C.P. v. Button,* 1963, 371 U.S. 415, 431–33, 83 S.Ct. 328, 9 L.Ed.2d 405. Because we think that similar values are endangered in this case, we hold that in order to state a claim for relief under the *Trucking Unlimited* exception, a complaint must include allegations of the specific activities, not protected by *Noerr,* which plaintiffs contend have barred their access to a governmental body. The deficiencies of McDonald's amended complaint in this regard are evident from what we have said above. Dismissal of that complaint was proper.

▮ In holding that plaintiffs' allegations are insufficient in this case, we are not adopting a rule that so-called "fact" pleading, as distinguished from "notice" pleading, is required in antitrust cases. We repudiated that notion in *Walker Distributing Co. v. Lucky Lager Brewing Co.,* 9 Cir., 1963, 323 F.2d 1, 3–4. What we do hold is that in any case, whether antitrust or something else, where a plaintiff seeks damages

---

fication means no more than that defendants who engage in *Noerr*-protected lobbying activities may nevertheless subject themselves to antitrust liability if they engage in activities external to or abusive of the legislative, administrative or judicial process, which activities, like the threats of opposition in *Trucking Unlimited,* tend "to harass and deter . . . competitors from having 'free and unlimited access' to (appropriate) agencies." *See id.* at

515, 92 S.Ct. at 614; Handler, *supra,* 73 Colum. L.Rev. at 436–39; Note *Limiting the Antitrust Immunity for Concerted Attempts to Influence Courts and Administrative Agencies: Analogies to Malicious Prosecution and Abuse of Process,* 86 Harv.L.Rev. 715, 732–35. No allegations that defendants have engaged in any external activities of this type appear in McDonald's complaint.

or injunctive relief, or both, for conduct which is prima facie protected by the First Amendment, the danger that the mere pendency of the action will chill the exercise of First Amendment rights requires more specific allegations than would otherwise be required.

It is no answer to say that there are better ways in which the defendants can show the lack of merit of the action. Reference is usually made to a motion for summary judgment. But this is not an answer in most cases. We are told that the motion is usually inappropriate in complex cases. *Poller v. Columbia Broadcasting Co.,* 1962, 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458. Moreover, it takes little to establish a conflict of evidence as to a material fact. And if the defendants, by affidavits fully conforming to the rule, show that the case is without merit, and if fear of perjury (a rather uncommon fear among the makers of affidavits) prevents the filing of directly contradictory affidavits, Rule 56 still gives the plaintiffs an escape hatch. They can claim that they won't know the facts until they have had discovery and get action on the motion postponed. Moreover, the sanctions of Rule 56(g) are invoked with "extreme infrequency." *See Alart Associates, Inc. v. Aptaker,* 2 Cir., 1968, 402 F.2d 779, 780.

The Supreme Court seems now to be aware of a fact long known to practitioners. The liberal discovery rules of the Federal Rules of Civil Procedure offer opportunities for harassment, abuse, and vexatious imposition of expense that can make the mere pendency of a complex lawsuit so burdensome to defendants as to force them to buy their peace regardless of the merits of the case. The decision in *Blue Chip Stamps v. Manor Drug Stores,* 1975, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539, an action based on § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 of the SEC, recognizes this fact and is to be a considerable extent based upon it:

> There has been widespread recognition that litigation under Rule 10b–5 presents a danger of vexatiousness different in degree and in kind from that which accompanies litigation in general. This fact was recognized by Judge Browning in his opinion for the majority of the Court of Appeals in this case, [9 Cir.] 492 F.2d [136,] at 141, and by Judge Hufstedler in her dissenting opinion when she said:
>
> > 'The purchaser-seller rule has maintained the balance built into the congressional scheme by permitting damage actions to be brought only by those persons whose active participation in the marketing transaction promises enforcement of the statute without undue risk of abuse of the litigation process and without distorting the securities market.' 492 F.2d at 147.

\*　　\*　　\*　　\*　　\*　　\*

We believe that the concern expressed for the danger of vexatious litigation which could result from a widely expanded class of plaintiffs under Rule 10b–5 is founded in something more substantial than the common complaint of the many defendants who would prefer avoiding lawsuits entirely to either settling them or trying them. These concerns have two largely separate grounds.

The first of these concerns is that in the field of federal securities laws governing disclosure of information even a complaint which by objective standards may have very little chance of success at trial has a settlement value to the plaintiff out of any proportion to its prospect of success at trial so long as he may prevent the suit from being resolved against him by dismissal or summary judgment. The very pendency of the lawsuit may frustrate or delay normal business activity of the defendant which is totally unrelated to the lawsuit.

\*　　\*　　\*　　\*　　\*　　\*

The potential for possible abuse of the liberal discovery provisions of the Federal Rules of Civil Procedure may likewise exist in this type of case to a greater extent than they do in other litigation. The prospect of extensive deposition of the defendant's officers and associates

and the concomitant opportunity for extensive discovery of business documents is a common occurrence in this and similar types of litigation. To the extent that this process eventually produces relevant evidence which is useful in determining the merits of the claims asserted by the parties, it bears the imprimatur of those Rules and of the many cases liberally interpreting them. But to the extent that it permits a plaintiff with a largely groundless claim to simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the process will reveal relevant evidence, it is a social cost rather than a benefit.

There are many cases in which, if the right to petition protected under the First Amendment is to have value, it must be exercised without delay. This is such a case. If the defendants did not appear at the Board's scheduled hearing, their right to petition would be lost. If this action were still pending below, that fact might have caused them not to appear at another hearing. The dangers that the Court saw in *Blue Chip* are also visible here.

*Otter Tail Power Co. v. United States,* 1973, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359, cited by plaintiffs, is not germane to the issue before us. In that case the district court had held that the *Noerr* immunity was inapplicable to the instigation of judicial proceedings. *United States v. Otter Tail Power Co.,* D.Minn., 1971, 331 F.Supp. 54, 62. One paragraph of the Supreme Court's opinion, 410 U.S. 379–80, 93 S.Ct. 1022, remanded the immunity issue for reconsideration in light of the intervening *Trucking Unlimited* decision, which recognized that *Noerr* did apply to judicial proceedings. *See* 404 U.S. at 510, 92 S.Ct. 609. That paragraph obviously cannot be read, as McDonald's would have us read it, as a holding that the *Otter Tail* facts fall within the *Trucking Unlimited* exception. But even if the Supreme Court had so held,

as the district court did on remand (D.Minn., 1973, 360 F.Supp. 451), the facts in *Otter Tail* are no more similar to those in our case than are the facts in *Trucking Unlimited.* As in *Trucking Unlimited,* the complaint in *Otter Tail* alleged that the defendant had threatened potential competitors—municipalities seeking to take over electric power facilities then operated by the defendant—with instigation of baseless proceedings—litigation which had the effect of delaying and increasing the expense of sale of municipal securities necessary to finance the takeover. The defendant allegedly hoped that the added expense and delay would force the municipalities to abandon their takeover plans and renew their power contracts with the defendant. Thus, the gravamen of the government's case in *Otter Tail* was not defendant's instigation of the litigation, a right guaranteed by the First Amendment, *see Trucking Unlimited, supra,* 404 U.S. at 510, 92 S.Ct. 609, but the fact that the defendant had used the threat of litigation as a bludgeon in its attempts to retain its monopoly in the regional electric power market.

In one respect *Otter Tail* is a "through the looking glass" version of the case at bar. In that case, whenever a community sought to go into the power business, Otter Tail sued. The effect of the mere filing of the action destroyed the community's ability to proceed. Nobody would buy its bonds while the action was pending. Mere filing was enough to accomplish Otter Tail's purpose. In our case, that is not so. Mere opposition would not defeat McDonald's purpose; to do that, defendants had to persuade the Board to rule in their favor—and it is alleged that they succeeded. The only bit of *in terrorem* litigation here is McDonald's action, an avowed purpose of which is to eliminate opposition, even the defendants' successful opposition, to its desires before the Board.

The proposed second amended complaint, submitted to the district court in conjunction with McDonald's motion to set aside the judgment and for leave to file the

complaint, adds little but adjectives to the first amended complaint.[5] The new complaint alleges that defendants have sponsored two other administrative proceedings against McDonald's. This activity falls squarely within the protection of the *Noerr* immunity. The new complaint also alleges that defendants have made false and malicious statements to the news media for the purpose of engendering public wrath against McDonald's. But the nature of the statements is not disclosed, and nothing specifically alleged indicates that the statements were not genuinely intended to influence governmental action, like the publicity campaign held immune in *Noerr*. Finally, it is now alleged for the first time that the defendants have picketed existing McDonald's restaurants, interfering with deliveries and harassing customers. Like McDonald's other allegations, this one also is wholly conclusory. We are not told the nature or extent of the picketing, and no specific facts are alleged to indicate that, by virtue of its purpose or manner, the picketing falls outside the traditional protection afforded this activity by the First Amendment. *See Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc.,* 1968, 391 U.S. 308, 313–14, 88 S.Ct. 1601, 20 L.Ed.2d 603.

The denial of either a motion under Rule 60(b)(6) or a motion for leave to amend may not be disturbed on appeal absent an abuse of the district court's discretion. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 1971, 401 U.S. 321, 330, 91 S.Ct. 795, 28 L.Ed.2d 77. *Komie v. Buehler Corp.,* 9 Cir., 1971, 449 F.2d 644, 647; *Vickery v. Fisher Governor Co.,* 9 Cir., 1969, 417 F.2d 466, 470; 3 Moore, Federal Practice ¶ 15.08(4). Because we agree with the district court that the additional material in the proposed second amended complaint adds little to the allegations of the first amended complaint, and because the second amended complaint would thus be subject to a motion to dismiss if filed, we cannot say that withholding leave to amend was an abuse of discretion. *See Vickery v. Fisher Governor Co., supra; DeLoach v. Woodley,* 5 Cir., 1968, 405 F.2d 496; *cf. Duggan v.*

---

5. Paragraphs 18 and 19 of the second amended complaint are virtually identical to paragraphs 18 and 19 of the first amended complaint. Paragraph 17 of the new complaint is as follows:

"The aforesaid combination and conspiracy has consisted of a continuing agreement and concert of action, the substantial terms of which have been and are:

(a) Motivated by an intent to deter plaintiffs from pursuing building permits for restaurants and to effectively foreclose plaintiffs from free and unlimited access to the Department of Public Works and the Board of Permit Appeals, the defendants would appear before the Board of Permit Appeals of the City and County of San Francisco and would oppose each and every permit granted to the Company by the San Francisco Department of Public Works;

(b) The defendant would secretly solicit the appearance before the Board of such of its members and other persons as it could secure to support its opposition to issuance of each such permit and that such other persons, while purportedly acting on behalf of themselves in said appearances, were acting on behalf of the defendants, which fact was not revealed to the Board;

(c) That all or substantially all of the persons who made an appearance before the Board in opposition to plaintiffs were members of defendants or were secretly solicited by defendants;

(d) That the defendants would threaten lack of political support to such Board members and other city officials who supported plaintiffs as were necessary;

(e) That defendants would engage in massive concerted action which was designed to engender public wrath against plaintiffs and which included, *inter alia,* the following activities:

(i) The knowing and malicious instigation and sponsorship, including financial support, by themselves and others acting secretly on their behalf of proceedings before the Human Rights Commission;

(ii) The knowing and malicious instigation and sponsorship, including financial support, by themselves and others acting secretly on their behalf of proceedings before the California Division of Labor Law Enforcement concerning business practices of McDonald's;

(iii) The dissemination of malicious and false statements through the news media designed to arouse public wrath against McDonald's;

(iv) Harassment of plaintiffs' customers at existing McDonald's restaurants; and

(v) Illegal picketing and disruption of the delivery of essential supplies to existing McDonald's restaurants."

*International Association of Machinists,* 9 Cir., 510 F.2d 1086 (1975).

In summary, we hold that the complaint charges nothing more than an agreement by the defendants to do that which, under *Noerr-Pennington,* they had a right to do. This action is in essence, an improper attempt to chill, indeed to prevent, the exercise of First Amendment rights. It was properly nipped in the bud by the trial judge.

Affirmed.

MARKEY, Chief Judge, United States Court of Customs and Patent Appeals (concurring):

I concur in the excellent opinion of Judge Duniway. The presence of Judge Browning's strong and scholarly dissent, particularly its clear and forceful exposition of pleading considerations, prompts these few remarks.

I cannot find an allegation that defendants "did foreclose" free and unlimited access. Paragraph 18 alleges the defendants' opposition was a coverup of a "plan" to foreclose. Moreover, it would appear that McDonald's could not allege such foreclosure. It had full access. Whatever "free and unlimited" may mean, it cannot, in my view, require *successful* access or access *unopposed.* Nothing of record indicates that McDonald's feared defendants' opposition or that its freedom and ability to seek future permits was in any manner "chilled" by the expected opposition of defendants. On the contrary, as Judge Duniway's opinion makes plain, the present suit for $11,-000,000 has an inherent chill factor with respect to defendants' freedom to oppose future permits.

In any event, the case illustrates, in my view, an effect of the unhappy marriage of "notice" pleading and virtually unlimited discovery.* The "might makes right" potential in that combination is, of course, completely contrary to the intent behind the effort to free the pre-trial phase from formalism and surprise.

In today's litigious milieu, a reversal based on rigid adherence to the Federal Rules of Civil Procedure herein is not likely to have a shock value sufficient to force reform. However that may be, I believe such an attractively conservative approach should await an instance in which the exercise of First Amendment rights of speech, association, and petition would not, as here, be so clearly impeded.

BROWNING, Circuit Judge (dissenting):

As the majority succinctly puts it, McDonald's alleged that defendants combined "to oppose, repeatedly, baselessly and in bad faith, the granting of building permits by the San Francisco Board of Permit Appeals (Board) for the construction of McDonald's restaurants." McDonald's also alleged that defendants, by their repeated and baseless opposition to every McDonald's application, intended to and did foreclose McDonald's from "free and unlimited access" to the Board and "thereby interfere[d] directly with the business activities and relationships of a competitor." Complaint, paragraph 18.

These allegations, together with averments of anticompetitive purposes and effect, state an antitrust claim under *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972): "A combination of entrepreneurs to harass and deter their competitors from having 'free and unlimited access' to the agencies and courts, to defeat that right by massive, concerted, and purposeful activities of the group are ways of building one empire and destroying another. . . . If these facts are proved, a violation of the antitrust laws has been established." *Id.* at 515, 92 S.Ct. at 614.

The majority finds this result unpalatable, and, to avoid it, distorts the substantive rule announced in *Trucking Unlimited* and applied in *Otter Tail Power Co. v. United*

---

* See National Conference of the Causes of Popular Dissatisfaction with the Administration of Justice, 70 *Federal Rules Decisions* 79 (1976).

*States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), *on remand,* 360 F.Supp. 451 (D.Minn.1973), *aff'd mem.,* 417 U.S. 901, 94 S.Ct. 2594, 41 L.Ed.2d 207 (1974). The majority also creates an unwarranted exception to the standard for pleading laid down in the Federal Rules of Civil Procedure and forcefully restated in *Conley v. Gibson,* 355 U.S. 41, 45–48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

## I

The majority assumes, though reluctantly, that defendants opposed the granting of building permits to McDonald's repeatedly, baselessly, and in bad faith, as alleged, and holds that, though deceptive, unethical, and undertaken to impose competitive injury, such conduct is immunized from the Sherman Act because it involves only the exercise of the First Amendment right of petition. The majority asserts that *Trucking Unlimited* applies only to defendants who have engaged in activities "external" to the administrative or judicial process (majority opinion note 4); and distinguishes *Otter Tail* on the ground that there the "gravamen" of the government's case was conduct by the defendants other than the instigation of litigation, a right guaranteed by the First Amendment. The majority's premise is that the Sherman Act cannot be violated by the exercise, in any manner or with any intent, of the First Amendment right to petition an administrative or judicial tribunal; some additional conduct is required, external to the proceedings before the tribunal.

Not only does the majority cite no authority for this rule, but *Trucking Unlimited* and *Otter Tail* are exactly to the contrary.

*Trucking Unlimited* holds as clearly as language can put it that the fact that defendants' conduct is protected by the First Amendment does not necessarily give them

immunity under the antitrust laws, and that Sherman Act liability may be based upon no more than an abuse of the defendants' own First Amendment right of access to an administrative tribunal. *California Motor Transport Co. v. Trucking Unlimited, supra,* 404 U.S. at 513–15, 92 S.Ct. 609. The Court expressly holds that institution of baseless, repetitive claims, although an exercise of the First Amendment right of petition, is an abuse of the administrative or judicial process that may evidence an intention to eliminate competition by barring competitors from meaningful access to adjudicatory tribunals, and thus violate the Sherman Act. *Id.* at 512–13, 515, 92 S.Ct. 609. The complaint in this case alleges precisely what *Trucking Unlimited* holds to be an antitrust violation. If there were any doubt as to the majority's meaning in *Trucking Unlimited,* it would be dispelled by the opinion of Justice Stewart who, with Justice Brennan, concurred in the judgment but declined to join the majority opinion specifically because the majority held that Sherman Act liability may be based upon the manner in which defendants exercise their First Amendment right of access to an adjudicatory tribunal. *Id.* at 517, 92 S.Ct. 609.[1]

In the *Otter Tail* litigation, the Supreme Court reaffirmed the doctrine that repetitious institution of proceedings before an adjudicatory tribunal may violate the Sherman Act if it reflects an intention to restrain competition by denying competitors meaningful access to the tribunal.

The case was before the Supreme Court twice. On the first occasion, as the majority notes, the Supreme Court simply remanded for reconsideration in light of *Trucking Unlimited.* In doing so, however, the Court stated without qualification that *Trucking Unlimited* had held that the Sherman Act "may also apply to the use of administrative or judicial processes where the purpose to suppress competition is evi-

---

1. The complaint alleges that the Board's function is adjudicatory. The majority suggests that it may in fact be legislative. The distinction is critical. *See California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 512– 13, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). *See also Rodgers v. FTC,* 492 F.2d 228, 232 n. 3 (9th Cir. 1974). The question cannot be resolved on the present record. The majority assumes, as it must, that the Board is an adjudicatory body.

denced by repetitive lawsuits carrying the hallmark of insubstantial claims . . . ." *Otter Tail Power Co. v. United States, supra,* 410 U.S. at 380, 93 S.Ct. at 1031. This language contains no suggestion that conduct external to the litigation itself is also required to make out an antitrust violation.

The majority asserts that the Supreme Court's decision on the first appeal in the *Otter Tail* litigation is not a holding that the facts established an antitrust violation. This is literally true. It is also misleading. On remand, the district court held that the facts did make out a violation of the Sherman Act.[2] The defendant again appealed. In a second decision, not mentioned by the majority, the Supreme Court affirmed this holding. *Otter Tail Power Co. v. United States,* 417 U.S. 901, 94 S.Ct. 2594, 41 L.Ed.2d 207 (1974).

The majority contends that *Otter Tail* involved not only actual litigation, but also threats of litigation, and thus satisfied the majority's dictum that conduct external to the exercise of the First Amendment right must be involved to forfeit antitrust immunity. Nothing in any of the opinions in the *Otter Tail* litigation suggests that the result reached depended upon the fact that

threats were used. The opinions refer only to a pattern of unsubstantial litigation employed to maintain a monopoly. An examination of the briefs filed in the Supreme Court for both appeals demonstrates that this was the crux of the charge. The government neither alleged nor proved that defendant employed threats of litigation as a planned part of defendant's program to maintain its monopoly, and the district court made no such finding.[3]

The defendants in *Trucking Unlimited* and *Otter Tail* did not lose antitrust immunity because they did anything in addition to participating in administrative and judicial processes. Immunity was lost because the defendants abused those processes by a pattern of conduct designed to eliminate competition by harassing and deterring competitors in their use of such processes and thus deny them meaningful access to such processes.

To repeat, there is no authority to support the majority's holding that abuse of administrative proceedings, although accompanied by the requisite intent, cannot alone constitute a violation of the Sherman Act; and *Trucking Unlimited* and *Otter Tail* hold to the contrary.[4]

---

**2.** On remand the district court found as follows:

> I find that the repetitive use of litigation by Otter Tail was timed and designed principally to prevent the establishment of municipal electric systems and thereby to preserve defendant's monopoly. I find the litigation comes within the sham exception to the *Noerr* doctrine as defined by the Supreme Court in *California Transport . . . .*

*United States v. Otter Tail Power Co.,* 360 F.Supp. 451, 451–52 (D.Minn.1973).

**3.** The only reference to threatened litigation in the briefs submitted to the Supreme Court in the first *Otter Tail* appeal is found in a footnote in the Statement of Facts of the government's brief, in which two incidents that might be interpreted as involving such threats are described. Brief for the United States at 27 n. 23. The same summary appears as footnote 9 at pages 11–12 of the Statement of Facts in the government's Motion to Affirm on the second appeal. It is frivolous to suggest that these incidental and ambiguous references formed the basis of the Court's ruling.

**4.** It was unnecessary for appellants to allege that they were in fact foreclosed from access to the Board. It was neither alleged in the complaint in *Trucking Unlimited* nor proven in the trial in *Otter Tail* that the ability of competitors to present their views was actually foreclosed or that competitors were either prevented from filing applications with the tribunal or from obtaining a hearing. It is enough to allege a denial of meaningful access.

It was also unnecessary for appellants to allege that the defendants' submissions were baseless or that defendants did not seek favorable action by the adjudicatory body. The complaint in *Trucking Unlimited* "did not allege that the presentations defendants made to the agencies and the courts were in themselves false, misleading, or lacking in evidentiary or legal support," and the district court held that the "sham" exception was inapplicable for this very reason. *Trucking Unlimited v. California Motor Transport Co.,* 432 F.2d 755, 762 (9th Cir. 1970). The antitrust defendants in both *Trucking Unlimited* and *Otter Tail* sought the favorable action of the tribunal when and if they could get it. The *Trucking Unlimited* complaint alleged that the antitrust defendants

## II

The second rule announced by the majority is procedural. "What we do hold," the majority states, "is that in any case, whether antitrust or something else, where a plaintiff seeks damages or injunctive relief, or both, for conduct which is prima facie protected by the First Amendment, the danger that the mere pendency of the action will chill the exercise of First Amendment rights requires more specific allegations than would otherwise be required."

Until the majority spoke, no complaint was subject to dismissal under Rule 12(b)(6) unless it failed to meet the liberal pleading standard of Rule 8(a). 5 C. Wright & A. Miller, Federal Practice & Procedure § 1356, at 590 (1969). *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Conley v. Gibson, supra,* 355 U.S. at 45–46, 78 S.Ct. 99; *Bodine Produce, Inc. v. United Farm Workers Organizing Committee,* 494 F.2d 541, 556 (9th Cir. 1974). This standard was applicable to all actions in federal courts, except those identified in Rule 9(b). 5 C. Wright & A. Miller, *supra,* § 1221, at 149. "[T]he rules reject the notion that certain actions inherently carry a different pleading burden than others." *Id.* at 151. Rule 9(b) requires greater particularity only in alleging fraud; and

this exception to the general rule of notice pleading was to be "construed narrowly and not extended to other legal theories or defenses." 5 C. Wright & A. Miller, *supra,* § 1297, at 405.

The majority's exception to the general rule would apply to any case involving "conduct which is prima facie protected by the First Amendment." The number of cases within the exception is undoubtedly large, including most antitrust litigation. "[T]he Sherman Act punishes the conspiracies at which it is aimed on the common law footing—that is to say, it does not make the doing of any act other than the act of conspiring a condition of liability." *Nash v. United States,* 229 U.S. 373, 378, 33 S.Ct. 780, 782, 57 L.Ed. 1232 (1913). Thus the crux of an offense under section 1 of the Sherman Act is an agreement or meeting of minds, usually arising out of associations and communication among businessmen. *See Giboney v. Empire Storage Co.,* 336 U.S. 490, 502, 69 S.Ct. 684, 93 L.Ed. 834 (1949); *quoted in California Motor Transport Co. v. Trucking Unlimited, supra,* 404 U.S. at 514, 92 S.Ct. 609. Yet we have recognized that no special rules apply to the pleading of antitrust cases and have specifically rejected the notion that it is necessary to plead "facts" rather than "conclusions" in such cases.[5] *Walker v. Lucky Lager*

---

"instituted the proceedings and actions . . . *with* or without probable cause, and *regardless of the merits* of the cases." *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 512, 92 S.Ct. 609, 612, 30 L.Ed.2d 642 (1972) (emphasis added). "Under this approach, the abusiveness of the petitioning practices is the key. The fact that in engaging in these practices the petitioner is actively seeking to influence the government decision-making is irrelevant." Note, Antitrust and the Constitution, 42 U.Cinn.L.Rev. 281, 304 (1973). As the court said in *Semke v. Enid Automobile Dealers Ass'n,* 456 F.2d 1361, 1366 (10th Cir. 1972), "Thus, the term 'sham' in this context would appear to mean misuse or corruption of the legal process." *See also Rodgers v. FTC,* 492 F.2d 228, 232 n.3 (9th Cir. 1974).

Even if it were relevant, the majority's assertion that "it is clear" that defendants were seeking official action is an unwarranted and premature factual determination. The district court made no such finding and there is no record to support it. As the Chief Justice

warned in *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974):

When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test.

**5.** The Supreme Court recently reversed the dismissal of an antitrust complaint for failure to state a claim upon which relief could be granted because the "concededly rigorous standard" for such a dismissal was not met. Justice Marshall, speaking for a unanimous Court, explained that "in antitrust cases, where 'the proof is largely in the hands of the alleged conspirators,' *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458, 464 (1962), dismissals prior to giving the plaintiff ample opportunity for

**1090**

*Brewing Co.,* 323 F.2d 1, 3–4 (9th Cir. 1963); *see Nagler v. Admiral Corp.,* 248 F.2d 319, 322–23 (2d Cir. 1957); 5 C. Wright & A. Miller, *supra,* § 1228, at 167.

The majority cites no authority to support its new rule. Three cases are referred to for the general proposition that the Supreme Court has "recognized the sensitivity of First Amendment guarantees to the threat of harassing litigation, and has erected barriers to safeguard those guarantees." [6] But none of these is a pleading case, and none suggests that the problem of protecting First Amendment rights from the chilling effect of harassing litigation should be solved by the creation of a judicial exception to the federal rules of pleading.

The majority quotes the discussion in *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), of the danger of vexatious litigation under Rule 10b–5, particularly because of the potential for abuse of the discovery provisions of the Federal Rules of Civil Procedure in this type of case. But again, the Supreme Court's opinion offers no support for the creation by judicial fiat of an exception to the Federal Rules of Civil Procedure as a means of dealing with the problem.

The power to prescribe general rules of civil procedure for the district courts is vested in the Supreme Court; rules promulgated pursuant to this authority must be reported to Congress before becoming effective. 28 U.S.C. § 2072.

It is of course necessary that courts interpret and apply the rules in particular cases, but this court has no authority to announce what is in effect a substantial modification of the rules.

discovery should be granted very sparingly." *Hospital Bldg. Co. v. Trustees of the Rex Hospital,* 425 U.S. 738, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338 (1976).

6. *Time, Inc. v. Hill,* 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967); *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); and *NAACP v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963).