WILMORITE, INC., Fayetteville Plaza, Inc. and James P. Wilmot, d/b/a Fayetteville Mall, Plaintiffs,

v.

EAGAN REAL ESTATE, INC., Eagan Real Estate Management Corp., Eagan Real Estate, Leo T. Eagan, William Eagan, Edward Eagan, Kimbrook Realty, Kimbrook Corp., CFB Development Corp., Camperlino and Fatti Builders, Inc., Frank Bargabos, Pyramid Development, Inc., Pyramid Brokerage Company, Inc., Michael Falcone, Allied Stores Corporation, Dey Brothers and Co., Inc., Winmar Company, Inc., Barney Deasy, Paul D. Lonergan, Katherine M. Shea, John Murphy, Earl Oot, Roger Smith, Arthur Reed and David C. Murray, Defendants.

No. 77–CV–47.

United States District Court, N. D. New York.

Sept. 29, 1977.

Harris, Beach, Wilcox, Rubin & Levy, Rochester, N. Y., for plaintiffs; James M. Hartman, Rochester, N. Y., of counsel.

Bond, Schoeneck & King, Syracuse, N. Y., for Eagan defendants; N. Earle Evans, Jr., Syracuse, N. Y., of counsel.

Hinman, Howard & Kattel, Binghamton, N. Y., for Allied defendants; Pamela S. Dwyer, New York City, Sullivan & Cromwell, New York City, of counsel.

Hancock, Estabrook, Ryan, Shove & Hust, Syracuse, N. Y., for Pyramid defendants; William L. Allen, Jr., Syracuse, N. Y., of counsel.

Nixon, Hargrave, Devans & Doyle, Rochester, N. Y., for Winmar defendants; John Stuart Smith, Rochester, N. Y., of counsel.

Urciuoli & Covino, Liverpool, N. Y., for Kimbrook defendants; Mario D'Arrigo, Liverpool, N. Y., of counsel.

Nottingham, Paltz, Cerio & Engel, Syracuse, N. Y., for defendant Murray; Richard L. Engel, Syracuse, N. Y., of counsel.

Bryant, O'Dell & Basso, Syracuse, N. Y., for defendant Pyramid Brokerage Co.; John D. Bryant, Syracuse, N. Y., of counsel.

Oot, Setright & Ciabotti, Syracuse, N. Y., for defendant Oot; Victor J. Ciabotti, Syracuse, N. Y., of counsel.

R. J. and P. R. Shanahan, Syracuse, N. Y., for defendant Reed; William F. Lynn, Syracuse, N. Y., of counsel.

## MEMORANDUM–DECISION AND ORDER

PORT, Senior District Judge.

## I. THE MOTIONS

In this $72,000,000 damage action for alleged violations of the antitrust laws, brought by a developer of regional shopping centers against competing developers of similar shopping areas and others in concert with them, the defendants have moved to dismiss the complaint for failure to state a claim or for summary judgment.

1. Regional shopping centers are large shopping centers which seek to draw customers from a wide suburban area. They usually feature one or more anchor stores, branch outlets of major department store chains, and a variety of other retail establishments. *See* Plaintiffs' Memorandum 6–8. They are distinguished from residential shopping centers which are smaller neighborhood shopping centers, primarily featuring grocery stores, drug stores and the like. *See Beneke v. Board of Appeals*, 51 Misc.2d 20, 273 N.Y.S.2d 121, 125 (Sup.Ct.1966).

2. The Eagan defendants include Eagan Real Estate, Inc., Eagan Real Estate Management Corp., Eagan Real Estate, Leo T. Eagan, William Eagan and Edward Eagan. The individual Eagan defendants control the Eagan entities either as partners, officers, directors or shareholders. Defendant Winmar Company is a member of the joint venture operating Penn Can Mall along with the Eagan defendants. Winmar is otherwise unrelated to the Eagans. Defendant Barney is a vice-president of Winmar.

## II. THE COMPLAINT

Accepting the material facts alleged in the complaint as true for the purposes of the motions to dismiss, *see Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 740, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976), it alleges as follows:

*Plaintiffs.*

Plaintiffs are developers and owners of regional shopping centers [1] in New York and other states. They developed and built Fayetteville Mall and are in the process of developing Great Northern Mall.

*Defendants.*

Twenty-seven defendants are named. They are mainly real estate investors and developers in Onondaga County. The Eagan defendants [2] are the largest real estate investors and brokers in the county, owning and operating three regional shopping centers, Shoppingtown, Fairmount Fair, and Penn Can Mall. The Kimbrook defendants [3] own and operate a Planned Unit Development (PUD) comprised of residential and commercial uses, in northern Onondaga County. The Kimbrook defendants are economically controlled by the Eagan defendants.[4] The Pyramid defendants,[5] who are

3. The Kimbrook defendants include Kimbrook Realty, CFB Development Corp., Camperlino and Fatti Builders, Frank Fatti, William J. Camperlino and William A. Bargabos. Again, the individual defendants control the named entities as either partners, officers, directors or shareholders.

4. A group of defendants bridges the Eagan and Kimbrook groups. Kimbrook Corp. is a partner in Kimbrook Realty which in turn operates the Kimbrook PUD. Defendants Paul D. Lonergan and Katherine M. Shea are officers of Kimbrook Corp. and also are employees of one of the Eagan interests. Through this chain, the Eagans allegedly control the Kimbrook defendants.

5. The Pyramid defendants include Pyramid Development, Inc. and Michael Falcone. Another defendant, Pyramid Brokerage Company was named in the complaint. At argument on the motions to dismiss, however, plaintiffs agreed to discontinue the action against this defendant as it, apparently, was unrelated to the other Pyramid defendants. This was done.

independent of the other developers, own and operate regional shopping centers in Onondaga County including Seneca Mall, River Mall and Pyramid Malls. The Allied defendants [6] operate a department store in Shoppingtown and are part of the joint venture now developing Penn Can Mall. In addition to these major defendants, various individuals [7] are named who either are related to one of the major groups of defendants or have participated in the opposition to plaintiffs' development in Onondaga County.

*Fayetteville Mall.*

In 1965 plaintiff, Wilmorite, Inc., planned to build a regional shopping center, Fayetteville Mall, in Fayetteville, New York. Plaintiff obtained an option to purchase a large tract of land known as Andrea Acres on which to build Fayetteville Mall. Fayetteville Mall would compete with Shoppingtown, located two miles away. In June of that year, efforts were initiated by plaintiffs to change the zoning of Andrea Acres from residential and agricultural to commercial. In January of 1967, the Manlius Town Board amended its zoning ordinance and rezoned Andrea Acres as "Regional Shopping District." [8]

Between June, 1965 and the change of the zoning ordinance creating the "Regional Shopping District", defendants conspired to obstruct its passage. They instigated opposition to the amendment among neighboring merchants and homeowners. They retained witnesses to appear on behalf of the homeowners at public hearings and created publicity adverse to the amendment. They instigated and financed legal proceedings in opposition to the rezoning.

The first legal proceeding brought by any of the defendants occurred after plaintiffs' initial efforts to obtain a rezoning from the town authorities. These efforts had resulted in the creation of a "Residential Shopping District" zone for Andrea Acres. Although not alleged in the complaint, the proceeding was cited by defendants: *Beneke v. Board of Appeals*, 51 Misc.2d 20, 273 N.Y.S.2d 121 (Sup.Ct.1966). This was an Article 78 proceeding which annulled the affirmance by the Zoning Board of Appeals of the issuance of a building permit for Fayetteville Mall on the grounds that there was insufficient evidence for the building inspector to determine whether the mall would comply with the requirements for the "Residential Shopping District" which had been created at plaintiff's behest. Subsequently, the ordinance was further amended to create the "Regional Shopping District" in January of 1967.

The complaint further alleged that after the zoning ordinance was amended to create the Regional Shopping District, two suits were commenced challenging the amendment. One was brought by 148 neighboring property owners and the other by an individual resident of the town. Both, however, were organized and financed by various defendants including the Eagans and Allied. Although both actions were ultimately dismissed by the New York Court of Appeals in 1971,[9] they had been successful below. Justice Farnham of the New York State Supreme Court held the amendment void and invalid for lack of a comprehensive plan and for lack of public notice concerning various conditions on the use of Andrea Acres.[10] The Appellate Divi-

---

**6.** The Allied defendants are Allied Stores Corporation and Dey Brothers and Co., Inc.

**7.** Other individual defendants include Earl Oot, a real estate developer, John Murphy, an Eagan employee, Roger Smith, an expert on development of shopping centers, Arthur Reed, a planning consultant, and David Murray, M.D.

**8.** Initially, the zone was changed from residential and agricultural to "Residential Shopping District." *See Beneke v. Board of Appeals*, 51 Misc.2d 20, 273 N.Y.S.2d 121 (Sup.Ct.1966).

Subsequently, the land was rezoned, this time as "Regional Shopping District." See *Albright v. Town of Manlius*, 28 N.Y.2d 108, 320 N.Y.S.2d 50, 268 N.E.2d 785 (1971).

**9.** *Albright v. Town of Manlius*, 28 N.Y.2d 108, 320 N.Y.S.2d 50, 268 N.E.2d 785 (1971).

**10.** The unreported decision in *Albright v. Town of Manlius*, Index No. 67–2797 (Sup.Ct., November 17, 1969), is attached to defendant Murray's motion papers.

sion reversed in part, holding that the amendment was enacted pursuant to a comprehensive plan, but affirmed as to the lack of notice of the conditions on the lands' use.[11]

The opposition to the zoning amendment and the subsequent lawsuits were organized and financed with the intent of delaying or preventing the development of Fayetteville Mall. Defendants intended to misuse the judicial process and to defeat the lawfully enacted zoning amendment in order to eliminate plaintiffs as competitors within Onondaga County. To that extent, the opposition and the lawsuits were "sham and wrongful legal proceedings in opposition to Fayetteville Mall." [12] More generally, defendants conspired to restrain trade, eliminate competition, prevent the development of plaintiffs' shopping center, limit the number of regional shopping centers and the extent of commercial space to be leased for that purpose, and finally, to monopolize the development of regional shopping centers within Onondaga County.

As a result of defendants' conduct, the construction of Fayetteville Mall was delayed for six years. The delay caused an increase in construction costs and a decrease in plaintiff's profits. The delay further prevented plaintiffs from obtaining certain commercial tenants for Fayetteville Mall and enabled Shoppingtown to lease space to a major department store and other tenants who had earlier signed lease options for Fayetteville Mall.

*Great Northern Mall.*

After the dismissal of the Fayetteville Mall lawsuits in 1971,[13] defendants' conduct is free of complaint by the plaintiffs until 1975, when plaintiffs initiated plans to develop Great Northern Mall. This proposed mall would compete with defendants' regional shopping center, Penn Can Mall.

Once again, the land involved was zoned residential and agricultural, and plaintiffs applied for a zoning change to permit the construction of a regional shopping center. At the same time, the Kimbrook defendants were applying for a zoning change to permit a 23 acre shopping center. By March of 1976, the zoning change for plaintiffs had been granted and Kimbrook withdrew its request.

Following the zoning change, litigation again ensued. In March, 1976, Kimbrook sued to declare the zoning amendment for Great Northern Mall invalid.[14] In June, Kimbrook brought another suit—an Article 78 to reverse the recommendation of the Onondaga County Planning Board which had recommended the change and the resolution of the Town Board of Clay by which the zoning amendment had been enacted. This latter case was dismissed by the court in December of 1976. As had been the case with the Fayetteville Mall litigation, both of these suits were brought at the direction of the Eagans and were encouraged and financed by those defendants along with Allied. In addition, these two recent suits were also instigated and financed by the Pyramid defendants.

The same motives which had inspired the earlier Fayetteville Mall litigation are responsible for these two suits. Defendants intend to misuse the judicial process and defeat the zoning change in order to delay or prevent the development of Great Northern Mall. The "sham and wrongful legal proceedings" [15] are motivated by anticompetitive and monopolistic purposes. Finally, the suits are affecting Great Northern Mall in the same manner that the earlier litigation affected Fayetteville Mall: Development and construction are delayed; costs are increased; profits are lost; plaintiffs are prevented from entering into leases; and competition is restricted.

---

**11.** *Albright v. Town of Manlius,* 34 A.D.2d 419, 312 N.Y.S.2d 13 (4th Dept. 1970).

**12.** Plaintiffs' Complaint ¶ 108(t).

**13.** *See* note 9 *supra.*

**14.** This suit has been discontinued with prejudice since the commencement of the case at bar. *See* Order of the Hon. Donald Miller, Justice of the Supreme Court of the State of New York, signed July 20, 1977.

**15.** Plaintiffs' complaint ¶ 108(ee).

Plaintiffs request the court to declare defendants' actions unlawful in violation of the Sherman Act's prohibitions on restraint of trade, 15 U.S.C. § 1, and monopolies, 15 U.S.C. § 2, and also in violation of New York law. An injunction against further unlawful activity is requested. In addition, claiming damages of $24,000,000, plaintiffs request judgment for $72,000,000, or treble damages on the antitrust claims, and $24,-000,000 on their unfair competition claim. Lastly, costs and attorneys' fees are asked for.

## III. CONTENTIONS

The contentions of the parties boil down to the confined issue of whether the facts before me insulate the defendants from antitrust liability under the *Noerr-Pennington* doctrine,[16] or bring the case within the sham exception[17] to that doctrine.

For the reasons stated, I find the defendants' conduct to be within the protection of *Noerr-Pennington* and, consequently, the defendants' motions to dismiss the complaint in its entirety are granted.[18]

## IV. DISCUSSION

The *Noerr-Pennington* doctrine has its genesis in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) (*Noerr*). The defendants in *Noerr*, twenty-four railroads, a trade association of their presidents, and a public relations firm, were charged with conspiring to restrain trade and monopolize the long distance freight business. Plaintiffs, various truckers and trucking interests, alleged that defendants

had engaged in a publicity campaign whose sole motivation was to destroy competition; that defendants had used the third party technique, *i.e.*, adverse publicity prepared by defendants was misrepresented as the views of independent persons; and that defendants had attempted to influence legislation and had persuaded the Governor of Pennsylvania to veto a pro-truckers measure.

The district court found that the defendants' publicity campaign was malicious, intended only to destroy competition and the plaintiffs' good will, and fraudulent through use of the third party technique. The district court held for the plaintiffs finding that defendants' publicity campaign violated the Sherman Act, although it refused to impose liability based on the veto of the truckers' legislation.[19] *Id.* at 133, 81 S.Ct. at 527.

The Supreme Court reversed. As its starting point it acknowledged, as the district court had, that "no violation of the Act can be predicated upon mere attempts to influence the passage or enforcement of laws." *Id.* at 135, 81 S.Ct. at 528. This is true even if such laws would produce a restraint or monopoly. The court reasoned that

> [i]n a representative democracy such as this, these branches of government [, legislative and executive,] act on behalf of the people and, to a very large extent, the whole concept of representation depends upon the ability of the people to make their wishes known to their representatives.

---

**16.** *See Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

**17.** *See California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972).

**18.** Defendants contend that once the federal claims are dismissed, the state claims should be dismissed for lack of pendent jurisdiction. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). At

oral argument plaintiffs conceded that, if the federal claims are dismissed, the entire complaint should then be dismissed as well.

**19.** Defendants counterclaimed in like tenor that plaintiffs' publicity campaign violated the Sherman Act. The counterclaim was dismissed. The district court found that plaintiffs' publicity campaign was defensive in nature, designed only to influence legislation and not to destroy the railroads as competitors. Thus no Sherman Act liability was imposed on the truckers. *Noerr, supra*, 365 U.S. at 134, 81 S.Ct. at 527.

*Id.* at 137, 81 S.Ct. at 529. The Sherman Act was intended to regulate business, not politics. Furthermore, the exercise of the First Amendment right to petition the government could be jeopardized by imposing antitrust liability in these circumstances.

Having concluded that no antitrust liability attaches to "mere solicitation of governmental action", *Id.* at 138, 81 S.Ct. at 530, the Court considered whether certain factors removed defendants' publicity campaign from the shield of antitrust immunity. First, defendants' anticompetitive motive was of no consequence. Even though defendants' "sole purpose . . . was to destroy the truckers as competitors", *Id.*, solicitation of government action remained immune. Secondly, even if the court finds the deception of the public and public officials to be deliberate and reprehensible, that is "of no consequence so far as the Sherman Act is concerned." *Id.* at 145, 81 S.Ct. at 533. Finally, the district court's finding that defendants intended to injure plaintiffs, even if they secured no legislation, was held again not to create liability. All the evidence dealt with defendants' efforts to influence the passage and enforcement of law. "There are no specific findings that the railroads attempted directly to persuade anyone not to deal with the truckers." *Id.* at 142, 81 S.Ct. at 532. Any fallout from defendants' campaign which injured plaintiffs was incidental and insufficient for creating antitrust liability. Characterizing the case as a "no-holds-barred fight", *Id.* at 144, 81 S.Ct. at 533, between plaintiffs and defendants, which had been fought "along lines normally accepted in our political system", *Id.* at 145, 81 S.Ct. at 533, the Court removed the case from the purview of the Sherman Act.

The Court, however, did leave room for antitrust liability under certain circumstances:

There may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified. *Id.* at 144, 81 S.Ct. at 533. But it concluded that those circumstances were not presented by the facts before it.[20]

The Supreme Court reaffirmed *Noerr* in a suit between trustees of the United Mine Workers retirement fund and coal company owners. *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965) (*Pennington*). In the district court, defendant coal companies won a verdict on their counterclaim that the union had squeezed smaller mines out of operation in violation of the antitrust statutes as part of its efforts to recover higher wages for miners. The district court had let the jury consider attempts by the union to influence TVA officials and the Secretary of Labor, insofar as such conduct was motivated by illegal intent. The Supreme Court reversed: "*Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose." *Id.* at 670, 85 S.Ct. at 1593. The Court went further than *Noerr,* however, and immunized such activity even if accompanied by conduct proscribed by antitrust law.

The principles of *Noerr* were extended to proceedings before administrative agencies and the courts in *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972) (*Trucking Unlimited*). "The right of access to the courts is indeed but one aspect of the right of petition." *Id.* at 510, 92 S.Ct. at 612. *Trucking Unlimited* also outlined the requirements for stating a claim under the sham exception to *Noerr.*

---

20. But this certainly is not the case here. No one denies that the railroads were making a genuine effort to influence legislation and law enforcement practices. Indeed, if the version of the facts set forth in the truckers' complaint is fully credited, as it was by the courts below, that effort was not only genu-

ine but also *highly successful.* Under these circumstances, we conclude that no attempt to interfere with business relationships in a manner proscribed by the Sherman Act is involved in this case.

*Noerr, supra,* 365 U.S. at 144, 81 S.Ct. at 533. (emphasis added).

Plaintiffs in *Trucking Unlimited* were truckers operating in California; defendants were truckers operating both within California and in interstate commerce. Plaintiffs alleged that defendants conspired to destroy competition and put plaintiffs and others out of business. Defendants' conspiracy was allegedly "a concerted action . . . to institute state and federal proceedings to resist and defeat applications by [plaintiffs] to acquire operating rights or to transfer or register those rights." *Id.* at 509, 92 S.Ct. at 611. More critical were other allegations which claimed that defendants' power and resources were used to deter plaintiffs' use of administrative and judicial proceedings "so as to deny them 'free and unlimited access' to those tribunals." *Id.* at 511, 92 S.Ct. at 612.[21]

> [T]he allegations are not that the conspirators sought "to influence public officials," but that they sought to bar their competitors from meaningful access to adjudicatory tribunals and so to usurp that decisionmaking process.

*Id.* at 512, 92 S.Ct. at 612. Plaintiffs further alleged that defendants initiated proceedings "with or without probable cause, and regardless of the merits of the cases." *Id.* Defendants' conduct indicated a purpose and intent to deprive plaintiffs of access to the agencies or courts—" 'to discourage and ultimately to prevent [plaintiffs] from invoking' the processes of the administrative agencies and courts and thus [fell] within the exception to *Noerr.*" *Id.*

Perjury, bribery and misrepresentations in the adjudicatory process corrupt it and effectively bar access to agency action or the courts.

Such circumstances state a claim within the sham exception to *Noerr.* Justice Stewart, concurring in the judgment but not in the court's opinion, noted that the complaint alleged that the defendants conspired not to invoke the processes of the courts and the administrative agencies, but to prevent plaintiffs from invoking these processes. *Id.* at 518, 92 S.Ct. at 615.

*Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973) (*Otter Tail*), is also relied upon by plaintiffs to support their claim that defendants' use of the administrative and judicial process was a sham. *Otter Tail* was a suit against a power company for monopolization of the retail distribution of electric power. The district court found that defendant had refused to sell or distribute power wholesale to municipally owned electric companies, had denied the municipal companies access to other suppliers of power, and had brought litigation to prevent the establishment of municipal electric companies. Defendants' actions had occurred in retaliation for municipalities terminating their franchises with defendant and seeking to establish their own electric systems. The district court's decision rendered prior to *Trucking Unlimited* held "*Noerr* does not free from antitrust sanctions the institution of court litigation." *United States v. Otter Tail Power Co.,* 331 F.Supp. 54, 62 (D.Minn. 1971). Consequently, the district court made no findings as to whether the litigation brought by Otter Tail was within the protective cover of *Noerr* or was sham and outside it. The allegations and proof of

---

21. Mr. Justice Stewart's concurring opinion summarizes the complaint as follows:

The complaint contains allegations that the petitioners have:

1. *Agreed* jointly to finance and to carry out and publicize a consistent, systematic and uninterrupted program of opposing 'with or without probable cause and regardless of the merits' every application, with insignificant exceptions, for additional operating rights or for the registration or transfer of operating rights, before the California PUC, the ICC, and the courts on appeal.

2. *Carried out* such agreement (a) by appearing as protestants in all proceedings instituted by plaintiffs and others in like position or by instituting complaints in opposition to applications or transfers or registrations; (b) by establishing a trust fund to finance the foregoing, consisting of contributions monthly in amounts proportionate to each defendant's annual gross income; (c) by publicizing and making known to plaintiffs and others in like position the foregoing program.

*Trucking Unlimited,* supra, 404 U.S. at 518, 92 S.Ct. at 615.

Otter Tail's conduct distinguish it from this case. The Supreme Court remanded for consideration in light of *Trucking Unlimited*.[22]

The thrust of these cases is that the First Amendment protects citizens in their efforts to petition any branch of the government. This protection is afforded, even if such action is anticompetitive or monopolistic, by immunizing it from liability under the antitrust laws. There is a limit to this protection, however; the immunity is lost if the challenged activity is in fact sham.

Plaintiffs argue that the more recent Supreme Court opinions have abrogated the *Noerr-Pennington* doctrine. They argue that the language of *Trucking Unlimited* and *Otter Tail* has extended the sham exception to *Noerr* so far that the exception literally swallows the rule of *Noerr*. This reading of the Supreme Court's opinions is unfounded.

*Trucking Unlimited* is based on the notion that the defendants could so abuse the adjudicatory process as to deny plaintiffs meaningful access to that forum. By such action, defendants could control the judicial or administrative process and thereby arrogate the adjudicatory function. This notion accords with *Noerr*; it does not weaken or restrict the basic thesis of *Noerr*.

■ The interest sought to be protected by *Noerr* was access to the various arms of the government. The First Amendment right of petition guarantees all citizens the right to appeal to the legislature or the judiciary. This right is not conditioned upon motive. The defendants in *Noerr* and *Pennington* were within their rights in seeking to influence the passage of legislation for reasons of personal gain. The vice in *Trucking Unlimited* was action which denied others access to the adjudicatory tribunal. In that case, defendants' abuse of the process rather than its legitimate use prevented plaintiffs from freely exercising their First Amendment right of petition

through administrative and judicial channels. Thus, the defendants in *Trucking Unlimited* could not avail themselves of *Noerr's* antitrust immunity, since this immunity grows out of respect for the free exercise of First Amendment freedoms.

The allegations of the complaint in *Trucking Unlimited* charged "that the power, strategy, and resources of the petitioners [defendants] were used to harass and deter respondents [plaintiffs] in their use of administrative and judicial proceedings so as to deny them 'free and unlimited access' to those tribunals", *Trucking Unlimited, supra,* 404 U.S. at 511, 92 S.Ct. at 612 resulting in effectively barring their use by the plaintiffs. No such charges can be made out against the defendants here on the material before me.

■ *Noerr* remains the guiding principle and *Trucking Unlimited* is its logical application. Appeal to the government, including use of the judicial process by instigation or commencement of lawsuits, cannot alone be the basis for anti-trust liability. Rather, it is the corruption of the administrative or judicial process that removes the shield of antitrust immunity provided by *Noerr*.

This reading of *Noerr* and *Trucking Unlimited* is supported by the reported cases. All of the cases which have refused to permit defendants to avail themselves of *Noerr's* immunity have rested on conduct which effectively denied plaintiffs the right of access to an arm of the government. The merits of the views pressed are only material if they illumine access-barring conduct.

In *Woods Exploration & Producing Co. v. Aluminum Company of America,* 438 F.2d 1286 (5th Cir. 1971), *cert. denied,* 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972) (*Woods*), the Fifth Circuit refused to extend the immunity of *Noerr* to defendants who had filed false information before a Texas regulatory agency. *Woods* was de-

---

22. On remand the district court found that Otter Tail's repetitive use of litigation was designed mainly to preserve its monopoly and was "sham." *United States v. Otter Tail Pow-*

*er Co.,* 360 F.Supp. 451 (D.Minn.1973), *aff'd,* 417 U.S. 901, 94 S.Ct. 2594, 41 L.Ed.2d 207 (1974).

cided before the Supreme Court's opinion in *Trucking Unlimited, supra,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), and interpreted the Ninth Circuit's opinion in that case to hold *"Noerr-Pennington inapplicable to the alleged filing of false nominations by defendants because this conduct was not action designed to influence policy,* which is *all* the *Noerr-Pennington* rule seeks to protect." *Woods, supra,* 438 F.2d at 1298 (emphasis added). It held "[i]n light of this determination . . . that the abuse of the administrative process here alleged does not justify antitrust immunity." *Id.* Having found that the administrative process was corrupted by the filing of false information, the result reached in *Woods* undoubtedly brings it within the sham exception of *Noerr-Pennington.* However, the Fifth Circuit's restricted view of *Trucking Unlimited* was dispelled when the Supreme Court emphasized that "[t]he right of access to the courts is indeed but one aspect of the right of petition." *Trucking Unlimited, supra,* 404 U.S. at 510, 92 S.Ct. at 612.

*Woods* was followed by the District of Columbia Circuit in *Israel v. Baxter Laboratories, Inc.,* 151 U.S.App.D.C. 101, 466 F.2d 272 (1972) (*Israel*). *Israel* was a suit which grew out of efforts to induce the FDA to bar one of plaintiff's drugs from the market. Plaintiff alleged that defendants had suppressed, concealed and misconstrued information before the FDA. In reversing the district court's grant of summary judgment in favor of defendants, the court of appeals construed *Woods* in conjunction with the recent decision of the Supreme Court in *Trucking Unlimited* and emphasized defendants' abuse of the administrative proceedings:

> The basic concern of the courts of appeal (and one District Judge) in both *Woods* and *Trucking Unlimited* may be deemed the integrity of the regulatory process. No actions which impair the fair and impartial functioning of an administrative agency should be able to hide behind the cloak of an antitrust exemption.

*Id.* at 107, 466 F.2d at 278 (footnotes omitted). The Tenth Circuit has similarly construed the sham exception to *Noerr:*

> [T]he term "sham" in this context would appear to mean misuse or corruption of the legal process. Therefore, the utilization of the court or administrative agency in a manner which is in accordance with the spirit of the law continues to be exempt from the antitrust laws.

*Semke v. Enid Automobile Dealers Association,* 456 F.2d 1361, 1366 (10th Cir. 1972). *See also Mountain Grove Cemetery Association v. Norwalk Vault Co.,* 428 F.Supp. 951, 955 (D.Conn.1977); *Associated Radio Service Co. v. Page Airways Inc.,* 414 F.Supp. 1088, 1096 (N.D.Tex.1976).

■ Applying these principles to the present case, the conduct attributed to the defendants is within the protective cover of *Noerr.* In broad brush conclusory allegations the defendants are charged with illegal actions before the Town Boards of Manlius and Clay, in connection with proposed amendments to their zoning ordinances, and with unlawfully contesting the zoning amendments in the courts of New York State.

In considering amendments to their zoning ordinances, the town boards were acting in a legislative capacity. *See Berenson v. Town of New Castle,* 38 N.Y.2d 102, 111, 378 N.Y.S.2d 672, 682, 341 N.E.2d 236, 243 (1975); *Thomas v. Town of Bedford,* 11 N.Y.2d 428, 433, 230 N.Y.S.2d 684, 687, 184 N.E.2d 285, 287 (1962). *Noerr, supra,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464, shields attempts to influence legislative action from the reach of the antitrust laws.

In *Bob Layne Contractor, Inc. v. Bartel,* 504 F.2d 1293 (7th Cir. 1974), the plaintiff, a subdivider, successfully obtained a change of zone from residential to commercial for part of a large residential subdivision being developed by it. The change of zone was opposed by an association of residents of the subdivision. The defendants in the antitrust suit included eleven property owners in the subdivision who had commenced an action in the state court to enforce a restrictive covenant common to the tract limiting the property to residential use. There

were also named as defendants the majority shareholder and the corporate owner of a nearby subdivision, as well as a retail store in the same community and its partner corporation. The stockholder· and the retail store both contributed to a fund to oppose the change of zone. Although the contributing subdivider and retail store would both suffer economic damage from the change of zone, their cooperation with the other defendants to defeat the change of zone did not deter the Court of Appeals from affirming summary judgment in defendants' favor. *Id.* at 1296.

In other contexts, where defendants have appealed in their own interests to local legislative bodies, such appeals have been immunized from attacks under the antitrust laws. *Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Board of Culinary Workers,* 542 F.2d 1076 (9th Cir. 1976), *cert. denied,* 430 U.S. 940, 97 S.Ct. 1571, 51 L.Ed.2d 787 (1977) (*Franchise Realty*) (opposition before the San Francisco Board of Permit Appeals to the grant of building permits for McDonalds restaurants); *Metro Cable Co. v. CATV of Rockford, Inc.,* 516 F.2d 220 (7th Cir. 1975) (activity inducing city council not to grant plaintiffs a franchise for cable TV).

Similarly, allegations that defendants commenced lawsuits or instigated their commencement, do not give rise to antitrust liability. The immunity created by *Noerr* extends to ·efforts to petition for relief of grievances through the judicial process. *Trucking Unlimited, supra,* 404 U.S. at 510, 92 S.Ct. at 611; *Mountain Grove Cemetery Association v. Norwalk Vault Co.,* 428 F.Supp. 951 (D.Conn.1977); *Central Bank of Clayton v. Clayton Bank,* 424 F.Supp. 163 (E.D.Mo.1976); *Ernest W. Hahn, Inc. v. Codding,* 423 F.Supp. 913 (N.D.Cal.1976); *Bethlehem Plaza v. Campbell,* 403 F.Supp. 966 (E.D.Pa.1975). *See also Taylor Drug Stores, Inc. v. Associated Dry Goods Corp.,* 560 F.2d 211 (6th Cir. 1977).

Plaintiffs acknowledge that opposition to zoning amendments and subsequent litigation, standing alone, are protected by *Noerr.* They contend, however, that the complaint alleges facts that bring it within the sham exception to *Noerr.* Their basic argument is that defendants' opposition to the zoning amendment was intended to delay or prevent the construction first of Fayetteville Mall and later of Great Northern Mall. They did not legitimately oppose the zoning amendments, but sought to monopolize the operation of regional shopping centers in Onondaga County and thereby to restrict competition. They did not properly invoke the courts but, rather, intended to misuse the judicial process for anticompetitive and monopolistic purposes. This abuse of the judicial forum is allegedly demonstrated by the ultimate dismissal of three of defendants' suits; plaintiffs contend that defendants' conduct amounts to a "*pattern of abusive resort to adjudicatory tribunals.*" Plaintiffs' Memorandum 51.

Defendants' opposition to the proposed zoning amendments before the Town Board of Manlius and Clay does not fall within the sham exception to *Noerr.* Defendants' instigation and financing of opposition to the zoning amendments does not rise to the level of sham. In *Noerr,* the use of the third-party technique, which involved misrepresentations and which was characterized as unethical, did not remove the shield of antitrust immunity from the defendants' actions. The allegations herein fall short of those in *Noerr* and, therefore, are clearly insufficient to state a claim under the sham exception.

Access-barring has been applied in the legislative setting, as well as the adjudicatory. In *Metro Cable Co. v. CATV of Rockford, Inc.,* 516 F.2d 220 (7th Cir. 1975), defendants prevailed upon the city council not to hold a hearing on plaintiff's application for a cable TV franchise. Even this was insufficient to remove the shield of *Noerr.* Since plaintiffs could gain access to council members through informal channels, the denial of a formal hearing did not amount to a denial of access. In *Franchise Realty, supra,* 542 F.2d 1076, the absence of any allegations that plaintiffs were deterred from applying to the San Francisco Department of Public Works for building

permits removed the case from the sham exception. This despite the presence of general allegations of access-barring. In the case at bar, plaintiffs have totally failed to state a claim that access to the town boards has been denied. The complaint shows that plaintiffs initiated the zoning proceedings. They applied for the zoning amendments for their regional shopping centers and both requests for amendments were granted. This is hardly access-barring. While plaintiffs argued that defendants "seek effectively to bar plaintiffs from all municipal zoning boards in Onondaga County", Plaintiffs' Memorandum 65, the allegations of the complaint obviously bely this assertion.

Plaintiffs next argue that defendants' lawsuits challenging the zoning amendments state a claim under the sham exception. Allegedly, the suits challenging the zoning amendments were brought with anticompetitive and monopolistic purpose: Defendants intended to delay and ultimately to prevent plaintiffs from entering the Onondaga County market for regional shopping centers. This intent assertedly removes the shield of *Noerr* and brings the case within the boundaries of the sham exception.

However, the Supreme Court explicitly held that intent does not alter the protection afforded by the First Amendment:

> The right of the people to inform their representatives in government of their desires with respect to the passage or enforcement of laws cannot properly be made to depend upon their intent in doing so. It is neither unusual nor illegal for people to seek action on laws in the hope that they may bring about an advantage to themselves and a disadvantage to their competitors.

*Noerr, supra,* 365 U.S. at 139, 81 S.Ct. at 530. The right to pursue or protect personal interests through the adjudicatory process is no less entitled to the same protection. *Noerr* went on to hold that, insofar as defendants' actions were "directed toward obtaining governmental action, [their] legality was not at all affected by any anti-

competitive purpose [they] may have had." *Id.* at 140, 81 S.Ct. at 531. This basic principle was unchanged by the decision in *Trucking Unlimited.* In that case the Court noted that the complaint alleged anticompetitive and monopolistic purposes behind defendants' conspiracy. But the Court then discussed this alleged intent in the context of access-barring allegations which were described as more critical. *Trucking Unlimited, supra,* 404 U.S. at 511, 92 S.Ct. 906. The gist of *Trucking Unlimited* is access-barring; motive is important to the extent that defendants, by resorting to the courts, intended to bar plaintiffs' access to that forum.

*Ernest W. Hahn, Inc. v. Codding,* 423 F.Supp. 913 (N.D.Cal.1976), is a case similar to the one at bar. Plaintiffs were developers of regional shopping centers; defendants were competing developers. Plaintiffs claimed that defendants had conspired to bring a series of baseless lawsuits with the purpose of precluding plaintiffs from obtaining necessary bonding and, thus, preventing plaintiffs from building competing shopping centers. The suits were intended to delay construction, create additional costs for plaintiffs and ultimately make development economically unfeasible. The court dismissed the complaint for failure to state a claim. It held that defendants' anticompetitive motive for suing did not create Sherman Act liability. Actions protected by the First Amendment under *Noerr* did not lose that protection because of defendants' anticompetitive intent. *Id.* at 916–17. The court pointed out how easily an antitrust complaint, such as the one here, can carry the germ of the very disease it purports to attack:

> The court made clear that conclusory allegations of access bar were not enough, since a complaint which could survive motions to dismiss because such a conclusory allegation was pleaded might deter a competitor from presenting its views in the public forum.

*Id.* at 916 (citing *Franchise Realty* ).

Other cases have reaffirmed the principle that access-barring is the cornerstone to the

sham exception. *Mountain Grove Cemetery Association v. Norwalk Vault Co.*, 428 F.Supp. 951 (D.Conn.1977); *Central Bank of Clayton v. Clayton Bank*, 424 F.Supp. 163 (E.D.Mo.1976); *Bethlehem Plaza v. Campbell*, 403 F.Supp. 966 (E.D.Pa.1975). These cases emphasized the need for alleging abuse, not mere use, of the adjudicatory process. In the instant case plaintiffs have not alleged any unethical or corrupt actions on the part of defendants in suing to declare the zoning amendments void. It is not alleged that perjury, bribery, misrepresentations, or any improprieties occurred during the litigation. Mere use of the state courts to challenge zoning amendments through Article 78 proceedings cannot be characterized as an abuse of the judicial process. On the contrary, it is one of the facets of the First Amendment right of petition protected by *Noerr*.

*Mountain Grove Cemetery Association*, *Central Bank of Clayton*, and *Bethlehem Plaza* involved single lawsuits by the defendants. All three cases noted that no "pattern of baseless, repetitive claims", *Trucking Unlimited, supra*, 404 U.S. at 513, 92 S.Ct. at 613, was alleged. *Trucking Unlimited* stated that such a pattern may evidence an intent to abuse the judicial process and bar plaintiffs from access to the courts. In the present case, however, no such pattern appears.

Three proceedings were instituted to invalidate the change of zone obtained by the plaintiff in connection with Fayetteville Mall. Kimbrook has instituted two proceedings in connection with the change of zone for Great Northern Mall.

The first suit instituted in connection with Fayetteville Mall resulted in a disposition favorable to the defendants herein.[23] The other two actions were consolidated. The defendants herein prevailed in the trial court [24] and were partially successful in the Appellate Division,[25] the determination of which was ultimately reversed by the Court of Appeals.[26]

The first Kimbrook action resulted in a dismissal in the trial court from which an appeal was filed.[27] The second proceeding, an Article 78 and declaratory judgment action, was terminated by an order of discontinuance with prejudice on motion of Kimbrook. Kimbrook moved for such disposition after the town board had granted it relief on its application for a change of zone permitting a shopping center within its Planned Unit Development and after the town board had passed a further resolution in connection with the change of zone obtained by the plaintiffs. In Kimbrook's view, these actions of the Clay Town Board eliminated its objections to the change of zone granted Wilmorite.[28]

These are hardly the threads from which a "pattern of baseless, repetitive claims", *Trucking Unlimited, supra*, 404 U.S. at 513, 92 S.Ct. at 613, can be woven. Free access to the courts does not mean unopposed access. *Franchise Realty, supra*, 542 F.2d 1086 (Markey, J., concurring).

Plaintiffs argue that the Supreme Court's opinion in *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022 (1973), supports their assertion that the mere filing of lawsuits constitutes access-barring conduct. Plaintiffs contend that defendants' suits achieve their anticompetitive purposes

**23.** *Beneke v. Board of Appeals*, 51 Misc.2d 20, 273 N.Y.S.2d 121 (Sup.Ct.1966).

**24.** *See* note 10 *supra*.

**25.** *See* note 11 *supra*.

**26.** *See* note 9 *supra*.

**27.** *See* Plaintiffs' Memorandum 54; Eagan Defendants' Memorandum 21.

**28.** *See* Order of the Hon. Donald H. Miller, Justice of the Supreme Court of the State of New York, July 20, 1977. Certified copies of

Justice Miller's Order, Kimbrook's motion, and supporting papers were provided to the court by Kimbrook's attorney herein; copies were forwarded to all counsel. These papers have been made a part of the Clerk's file in this action.

After receipt of these papers, plaintiffs' counsel acknowledged the fact of the discontinuance of Kimbrook's state court action but disputed the materiality of this fact to the instant suit.

through the *in terrorem* impact which the suits exert on plaintiffs.

Plaintiffs have overstated the holding in *Otter Tail*. The *Supreme Court* merely remanded the case for consideration under *Trucking Unlimited*, because the district court had held *Noerr* inapplicable to the judicial setting. The Supreme Court's opinion is silent as to whether the allegations fall under the protection of *Noerr* or within the sham exception. On remand the district court merely found that the repetitive litigation brought by defendant was "designed principally to prevent the establishment of municipal electric systems and thereby to preserve defendant's monopoly." *United States v. Otter Tail Power Co.*, 360 F.Supp. 451 (D.Minn.1973), *aff'd*, 417 U.S. 901, 94 S.Ct. 2594, 41 L.Ed.2d 207 (1974). The district court held that this litigation came within the sham exception to *Noerr*. What plaintiffs overlook in relying on *Otter Tail* is that defendant's conduct there was part of a larger unlawful scheme characterized by monopolistic practices. The district court had earlier found that Otter Tail had refused to sell or distribute power to municipal systems and had denied these systems access to other suppliers of power. In addition, the litigation brought by defendant made it impossible to obtain a "no-litigation certificate"[29] thereby precluding proposed municipal electric systems from obtaining bonding necessary for their establishment. *See Otter Tail Power Co. v. United States*, 410 U.S. 366, 368–72, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973).

Plaintiffs' reliance on *Associated Radio Service Co. v. Page Airways, Inc.*, 414 F.Supp. 1088 (N.D.Tex.1976), which denied a motion to dismiss, disregards similar allegations. Defendants in that case were alleged to have conspired to commit a series of acts including interference with business relationships, pirating of proprietary information, destruction of plaintiff's records, and spurious litigation. In such a context, which included allegations of attempts "to manipulate the court system", *Id.* at 1096, plaintiff's contention that the complaint stated a claim under the sham exception was sustained.

*Otter Tail* and *Associated Radio* both held that defendants' use of litigation came within the sham exception when it was part of a larger scheme employing unprotected anticompetitive and monopolistic practices. In the case at bar, plaintiffs allege only that defendants opposed zoning amendments and litigated their validity. These actions are all protected by the First Amendment. No actions violating the antitrust laws and not implicating the First Amendment are alleged. Defendants conducted no broad scheme of monopolistic activity of which litigation was only a part. *See Ernest W. Hahn, Inc. v. Codding*, 423 F.Supp. 913, 916 (N.D.Cal.1976).

Finally, defendants argue that *Noerr's* vitality has been seriously undermined by the recent decision in *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976). They contend that *Noerr* is derived from *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), and that "*Cantor* dramatically reduces the antitrust immunity formerly granted under *Parker v. Brown.*" Plaintiffs' Memorandum 67. Plaintiffs ignore that *Noerr* is based not only on *Parker*, but also on respect for the First Amendment. Furthermore, *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), emphasizes that plaintiffs' concern for the continuing vitality of *Parker* is misspent. The Court in *Bates*, although divided as to the First Amendment issue, was unanimous in its affirmance of "the Arizona Supreme Court's determination that appellants' Sherman Act claim is barred by the *Parker v. Brown* exemption." *Id.* at 363, 97 S.Ct. at 2698.

Although the defendants' motions to dismiss the complaint were based on Rule 12(b)(6), Fed.R.Civ.P., the plaintiffs addressed themselves extensively to the sufficiency of the complaint under Rule 8, Fed. R.Civ.P. Although this fifty-page complaint would not likely be termed the short

---

**29.** *United States v. Otter Tail Power Co.*, 331 F.Supp. 54, 62 (D.Minn.1971).

statement required by Rule 8, failure to comply with that rule has not been considered by me. In discussing Rule 8, plaintiffs cite *Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976), for the proposition that dismissals in antitrust cases should be granted sparingly before the plaintiff has had an opportunity for discovery. Plaintiff's Memorandum 33. Plaintiffs also contend that leave to replead should be granted for noncompliance with Rule 8. Plaintiffs' Memorandum 78. Neither of these principles is absolute. *See George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.*, 554 F.2d 551 (2d Cir. 1977) (*Frey*).

The dismissal here is on substantive grounds and not for failure to comply with Rule 8. Accordingly, "the well-pleaded material facts alleged in the complaint [have been] taken as admitted." *Id.* at 553 (citing *Gumer v. Shearson, Hammill & Co.*, 516 F.2d 283, 286 (2d Cir. 1974)). And because this is an antitrust action within the protection of the *Noerr-Pennington* doctrine, its dismissal prior to discovery is not inappropriate. *See Frey, supra*, 554 F.2d 555, and cases cited therein.

Ordinarily, upon a dismissal for failure to state a claim, I would grant leave to amend the complaint. In this case, however, no purpose would be served by denying an absolute dismissal at this time. Upon the oral argument, under questioning by the court, plaintiffs' counsel stated that all of the relevant facts, other than evidentiary details, which existed in support of plaintiffs' claim were alleged in the complaint. The allegations of the complaint, as fleshed out by the additional material supplied and considered by me,[30] clearly demonstrate the lack of factual issues and the entitlement of defendants to summary judgment dismissing the complaint.

The complaint should be dismissed against all defendants. Since the grounds discussed herein are dispositive of all motions made, it is unnecessary to consider the motions to dismiss the complaint as against individual defendants based on specific deficiencies in the complaint. Having considered matters outside the complaint, for the reasons herein, it is

ORDERED, that the defendants' motions to dismiss the complaint be and the same hereby are treated as motions for summary judgment, Rule 12(b)(6) Fed.R.Civ.P.; and it is further

ORDERED, that said motions be and the same hereby are granted in all respects; and it is further

ORDERED, that the clerk enter a judgment dismissing the complaint herein, as to all defendants.

---

**30.** In addition to the materials supplied the court through affidavits, exhibits, published and unpublished opinions relating to Fayetteville Mall and Great Northern Mall, *see* notes 8–11 *supra*, I received a letter dated August 2, 1977, from Kimbrook's attorneys. *See* note 28 *supra*. Copies of the letter and enclosures were forwarded to all attorneys for response and plaintiffs' counsel did respond.