LANDMARKS HOLDING CORPORA-
TION, et al., Plaintiffs-Appellants,

v.

David W. BERMANT, et al.,
Defendants-Appellees.

No. 12, Docket 81–7092.

United States Court of Appeals,
Second Circuit.

Argued Sept. 9, 1981.

Decided Nov. 17, 1981.

James O'Connor Shea, New Haven, Conn. (Ralph K. Winter, New Haven, Conn., of counsel), for plaintiffs-appellants.

Milton J. Schubin, New York City (Kaye, Scholer, Fierman, Hays & Handler, New York City, Milton Handler, James B. Henry, New York City, of counsel), for defendants-appellees.

Before LUMBARD, MANSFIELD and VAN GRAAFEILAND, Circuit Judges.

LUMBARD, Circuit Judge:

Plaintiffs, partners in a real estate development, appeal from an order entered in the District of Connecticut on January 19, 1981, granting summary judgment to the defendants in an antitrust suit. The complaint alleged that the defendants, consisting of two existing shopping centers, individuals who were managers and/or part owners of those centers, and certain nearby property owners and residents, had conspired to prevent the plaintiffs from opening a competing shopping center by organizing protracted opposition before state administrative agencies, by litigating in the state courts in bad faith, and by soliciting and subsidizing others to bring baseless litigation in the state courts. Judge Eginton held that defendants' alleged actions were protected activity and dismissed the complaint. We disagree and we reverse.

I.

As this case is before us on appeal from summary judgment, we must take as true the facts alleged in the complaint and as shown in affidavits and the discovery record. Hamden is a town of approximately 50,000 people situated in the Connecticut countryside six miles north of New Haven. In the 1960's, two shopping malls, Hamden Plaza and Hamden Mart, had the Hamden regional shopping market to themselves. Their freedom from competition was threatened, however, when in 1969 the plaintiffs proposed to build a modern, enclosed shopping mall on 104 acres of land that they owned on Evergreen Avenue in Hamden, less than one mile from Hamden Plaza. This case arises out of defendants' persistent, and ultimately successful, efforts to delay and block construction of that competing shopping center.

In 1969, the May Department Stores Co. signed a partnership agreement with plaintiffs to develop and operate a shopping center on the Evergreen Avenue site. The contract required plaintiffs to obtain the necessary zoning changes and provided that either party could terminate the agreement should the zoning reclassification not be forthcoming.

Upon learning of plaintiffs' plans, the owners of Hamden Mart [1] and Hamden Plaza (the "Plaza defendants") decided to oppose the development. David Bermant, a co-owner of Hamden Plaza, conceded in a deposition taken on March 2, 1973:

We found out that this center is subject to rezoning by the Town, plus the expenditures of huge sums for new roads to serve the mall, also by the Town.... it was decided to oppose this effort with every means, to either defeat or delay for as many years as possible, this proposed center.

The defendants planned to litigate regardless of the merits, anticipating that even if they lost they "could delay the development of this property a minimum of three to five years..." This delay, defendants hoped, would induce the May Department Stores Co. to abandon its plans and encourage prospective tenants to sign leases in Hamden Plaza or Hamden Mart rather than wait for the new center to be built.

Construction of the proposed mall required the plaintiffs to seek three separate rulings by the Hamden Planning and Zoning Commission ("HPZC"). First, plaintiffs

---

1. Hamden Mart has settled and is no longer a defendant in this action.

had to apply to the HPZC to adopt regulations creating a zoning classification for shopping centers. Prior to 1970, Hamden had no such classification.[2] Second, the plaintiffs needed to have the HPZC adopt street layout plans for access highways leading to the mall. Third, the plaintiffs needed a zoning change for their particular parcel from manufacturing classification to the newly created regional shopping classification.

The Plaza defendants appeared personally before the HPZC to oppose the changes sought by the plaintiffs. They appealed from each adverse decision of the HPZC to the Court of Common Pleas—knowing they lacked standing to do so—and from there to the Connecticut Supreme Court. They secretly funded a massive publicity campaign to arouse the citizenry of Hamden to oppose the development as a threat to the "quality of life." Finally, they solicited and subsidized opposition by residents of Hamden (the "landowner defendants") before the HPZC and in the Court of Common Pleas, although they knew many of the claims had no merit.

In the spring of 1970, in response to plaintiffs' petition, the HPZC adopted regulations creating a regional shopping center zoning classification and approved the street layout plans sought by the plaintiffs. From the HPZC rulings, Hamden Plaza, Hamden Mart, and two of the landowner defendants, Melinda Daniels and George Neal (the "Neals"), took a total of five appeals to the Court of Common Pleas. It was well settled under Connecticut law then that the Plaza defendants lacked standing to take any of these appeals and the Neals lacked standing to appeal from

the adoption of the zoning classification regulations.[3]

Despite their initial success in the HPZC, the plaintiffs failed in their first attempt to secure a zone change for the Evergreen Avenue Property. In July 1970, the HPZC denied their application after the appearance in opposition of numerous landowners, including those made party defendants here. The Plaza defendants appeared and argued, among other things, that the HPZC should reject the application because the new mall would compete with the Mart and Plaza. At the heart of much of the local opposition to the plaintiffs' application was a massive publicity campaign secretly organized and funded by the Plaza defendants.

Plaintiffs succeeded with their second application for a zoning change, which the HPZC granted on June 21, 1971. The defendants then appealed from this HPZC ruling as they had from all the other decisions of the HPZC. In October of 1971, the appeals by the Plaza defendants and the landowners from the adoption of the regional shopping zoning classification, the street layout plans, and the granting of the zone change on the Evergreen Avenue Property were all consolidated for hearing in the Court of Common Pleas.

Many of the appeals taken by the landowners were solicited and financed by the Plaza defendants. Three lawyers, who had already been retained by the Plaza defendants, offered to represent landowner residents in litigation against the proposed mall, free of charge. These lawyers never disclosed to their landowner-resident clients their simultaneous representation of the

---

**2.** The record does not disclose how Hamden Mart and Hamden Plaza came to be built in the absence of a regional shopping zoning classification.

**3.** The regulations creating the regional shopping center zoning classification were "floating zones" that had no effect until utilized in zoning a particular parcel of land. A 1969 Connecticut Supreme Court decision held that the validity of such "floating zones" could be challenged only in an appeal from the zoning of a particular parcel of land, not from the promul-

gation of the regulations. *Sheridan v. Planning Board*, 159 Conn. 1, 266 A.2d 396 (1969). Hence, neither the Plaza defendants nor the Neals had standing to appeal from the adoption of these regulations.

The Plaza defendants lacked standing to appeal from the adoption of the street layout plans because they were not record owners or mortgagees of land located in those plans. *See* Conn.Gen.Stat. § 8–30. The Neals did own such property.

Plaza defendants, who were paying most of the legal fees. In the ensuing litigation, the Plaza defendants subsidized the lawyers and litigation expenses for the landowners without the knowledge or consent of those landowners.

After trial in the Court of Common Pleas, judgment was entered on June 27, 1972, dismissing all the appeals by the Plaza defendants for lack of standing. Likewise, all the appeals of the landowner defendants were dismissed with two exceptions: (1) A portion of Melinda Daniels's appeal from the adoption of the street layout plans was referred for further hearings on the compensation due her for the taking of her property; and (2) the court upheld the claim that the HPZC had not approved the zone change by a ⅔ majority, as required when a valid protest petition is filed.[4]

All the parties appealed[5] from each adverse decision and the Connecticut Supreme Court granted certification.[6] Once again, the Plaza defendants subsidized the appeals of the landowner defendants. Moreover, the Plaza defendants deliberately delayed these appeals. When plaintiffs sought an expedited hearing before the Supreme Court, the Plaza defendants wrote to the Chief Judge asking that the appeal be postponed until the full record below was printed, which entailed considerable delay. Although a letter from the Plaza defendants' counsel stated that the defendants also sought to expedite the appeal, a copy of the letter produced from the defendants' files bore on it, in the handwriting of defendant Rudolf Starr, the words, "This is purely bull to show that we are not trying to delay proceedings." This inscription was initialed by David Bermant, defendant and co-owner of Plaza Mart, showing that he read it.

While the appeals to the Supreme Court were pending, the plaintiffs submitted a third application for a zoning change on a smaller portion of the Evergreen Avenue property.[7] The HPZC approved this application on October 2, 1972, and again the Plaza defendants and landowner defendants took separate appeals to the Court of Common Pleas. The court dismissed the appeal of the Plaza defendants for lack of standing and the appeal of the landowner defendants on the merits. The Supreme Court denied certification on October 3, 1973, and the zone change of plaintiffs' property to regional shopping became final. However, the validity of the road layout plans and of the regulations creating the regional shopping zoning classification remained uncertain pending the Supreme Court's disposition of the first set of appeals.

In an attempt to expedite disposition of the remaining appeals, plaintiffs met with the lawyer for the Neals to discuss a possible settlement. Plaintiffs claimed that the continued presence of the Neals in the pending appeals was crucial to the Plaza defendants' delaying tactics, since the Neals alone had standing to raise objections to the HPZC's failure properly to notify them of the proposed new street layout as required by statute. A quick settlement with the Neals, plaintiffs hoped, would have facilitated summary disposition of the remaining

---

**4.** Conn.Gen.Stat. § 8–3 requires a ⅔ vote for zoning changes where 20% of the property owners within 500 feet of the site sign a protest petition. Here, the defendants submitted a protest petition with 1,200 names on it, but refused to identify to the HPZC which of the signatories lived within the 500 foot radius. The HPZC consequently decided the petition was invalid. In the Court of Common Pleas, the defendants offered for the first time proof that the required number of landowners had signed the petition, and the court upheld the petition.

**5.** Hamden Mart was the only party not to pursue its appeal to the Connecticut Supreme Court.

**6.** There is no appeal by right to the Connecticut Supreme Court in zoning cases. Following decision in the Court of Common Pleas (now the Superior Court) the losing party may petition the Connecticut Supreme Court for certification. If two justices vote to grant certification, the Supreme Court will hear the appeal. Conn. Gen.Stat.Ann. §§ 8–8, 8–9. Certification is a matter of "sound judicial discretion and will be allowed only where there are special and important reasons therefor." Conn.Practice Book, Supreme Court Rules, § 761C.

**7.** The third application was for a zone change on 82 acres; the original application sought a change for 104 acres.

appeals, since only a single, meritless issue would have remained: the Plaza defendants' standing to appeal from HPZC decisions. Accordingly, since the crux of the Neals' complaint was that the proposed mall would be too close to their house, plaintiffs offered to pay the cost of moving the house to a more remote location on the Neals' property. However, the attorney for the Neals, who, unbeknownst to the Neals, was receiving payments from the Plaza defendants, never communicated the settlement offer to Neals.[8]

The Supreme Court ultimately upheld adoption of the regional shopping center classification and the street layout plans. *Schwartz v. Town Plan and Zoning Commission*, 168 Conn. 20, 357 A.2d 495 (1975); *Schwartz v. Town of Hamden*, 168 Conn. 8, 357 A.2d 488 (1975).[9] The net result of the fourteen actions brought by the various defendants was that by 1975 the plaintiffs had succeeded in obtaining everything from the HPZC that they needed. Every claim of the Plaza defendants and their straw litigants failed, save for the protest petition, which was rendered moot by the plaintiffs' success in their application for a modified zoning change. Yet the plaintiffs' courtroom victories proved Pyrrhic, for the protracted delays had by then forced them to abandon the development.

Plaintiffs brought this suit in 1971 to recoup their losses and later amended their complaint in 1977 and again in 1979 to include the obstructive and protracted litigation conducted by the defendants in opposition to plaintiffs' plans.

The defendants finally moved for summary judgment in June 1980, claiming that the First Amendment shielded their activities from antitrust liability, citing the *Noerr-Pennington* doctrine, *Eastern Railroads Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). The plaintiffs claimed that the defendants' acts fell within the "sham litigation" exception to that doctrine, *e. g., California Motor Transport v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); *see Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 635 n.6, 97 S.Ct. 2881, 2889 n.6, 53 L.Ed.2d 1009 (1977). The district court held that this case was governed by *Miracle Mile Associates v. City of Rochester*, 617 F.2d 18 (2d Cir. 1980) and *Wilmorite, Inc. v. Eagan Real Estate, Inc.*, 454 F.Supp. 1124 (N.D.N.Y.1977), *aff'd. without opinion*, 578 F.2d 1372 (2d Cir.), *cert. denied*, 439 U.S. 983, 99 S.Ct. 573, 58 L.Ed.2d 655 (1978). Placing great stress on the language in *Miracle Mile* that "access barring is the cornerstone to the sham exception," Judge Eginton granted summary judgment, stating that it is "difficult for the Court to discern how plaintiffs have been denied access to any forum." Moreover, Judge Eginton noted that although the Plaza defendants' conduct in soliciting and subsidizing litigation and withholding settlement offers was "arguably a violation of the Canons of Ethics," such conduct was nevertheless immunized by the *Noerr-Pennington* doctrine.

## II.

■ The central issue on appeal is whether Plaza's conduct, as alleged in the complaint and revealed through discovery, is immunized by the First Amendment from

---

8. In 1976, the lawyer for the Neals, Douglas Daniels, sued George Neal for $25,000 for professional services rendered in the litigation against the zoning changes. George Neal counterclaimed for malpractice, alleging that while Daniels represented Neal, Daniels: (1) appeared in litigation to oppose the shopping mall, without Neal's knowledge; (2) failed to convey a settlement offer from the plaintiffs, and (3) failed to disclose to Neal that Daniels had received payments from the Plaza in similar pending litigation.

9. In 1974, the Connecticut Supreme Court affirmed the decision of the Court of Common Pleas upholding the protest petition and striking down the 1971 zoning change for failure to satisfy the ⅔ majority requirement. However, this decision had no effect on the validity of the HPZC's approval in 1972 of the modified zoning change, which approval was affirmed and became final in 1973.

antitrust liability under the *Noerr-Pennington* doctrine, *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), or whether it falls within the "sham exception" to that doctrine as carved out by the Supreme Court in *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), and in *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), *affirmed after remand*, 417 U.S. 901, 94 S.Ct. 2594, 41 L.Ed.2d 207 (1974).

■ In *Noerr* and *Pennington, supra*, the Supreme Court held that attempts to influence the legislative process, even though motivated by a desire to reduce or eliminate competition, were protected by the First Amendment. At the same time, however, the Court qualified this immunity by providing that such attempts would be actionable under the antitrust laws where they are a "mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relations of a competitor." *Noerr, supra*, 365 U.S. at 144, 81 S.Ct. at 533. *California Motor Transport v. Trucking Unlimited, supra*, expanded this "sham" exception, stating that "unethical conduct in the setting of the adjudicatory process" or the pursuit of "a pattern of baseless, repetitive claims" cannot seek refuge under the *Noerr-Pennington* doctrine since they constitute an abuse of process "effectively barring . . . access to the agencies and courts." 404 U.S. at 512–13, 92 S.Ct. at 612–613. *Accord, Otter Tail Power Co. v. United States, supra*, 410 U.S. at 380, 93 S.Ct. at 1031 ("repetitive lawsuits carrying the hallmark of insubstantial claims" are unprotected); *Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 635 n.6, 97 S.Ct. 2881, 2889, n.6, 53 L.Ed.2d 1009 (1977) ("repetitive, sham litigation may constitute an antitrust violation") (plurality opinion); *see generally* R. Bork, The Antitrust Paradox 359 (1975); Fischel, *Antitrust Liability for Attempts to Influence Government Action: the Bases and Limits of the Noerr-Pennington Doctrine*, 45 U.Chi.L.Rev. 80 (1977). In short, abuse of the administrative and judicial process through unethical lawyer conduct and repetitive filing of insubstantial claims is unprotected by the *Noerr-Pennington* immunity.

■ Here, the activities alleged, if credited, show that the Plaza defendants conspired to prevent the plaintiffs from erecting a competing shopping center. In furtherance of this conspiracy, the Plaza defendants appealed to the Court of Common Pleas and Connecticut Supreme Court from each decision of the HPZC, knowing that they lacked standing to do so. These defendants had no reasonable hopes of winning these appeals, only of securing delay. Each such appeal was dismissed, as were most of the landowner appeals solicited and financed by the Plaza defendants. Furthermore, the Plaza defendants deliberately protracted the proceedings by misrepresenting to the Chief Justice of the Connecticut Supreme Court that they needed extra time to have the record printed; among themselves, they acknowledged this request to be "purely bull." Finally, an attorney representing both the Plaza defendants and the Neals failed to communicate a settlement offer from the plaintiffs to the Neals. Acceptance of this offer by the Neals would have removed a major obstacle to the rapid resolution of the remaining appeals before the Connecticut Supreme Court. In sum, by the bringing of numerous meritless appeals, by deliberate delay in the prosecution of those appeals, by the solicitation and subsidization of meritless litigation by the landowners, and by their attorney's failure to convey a settlement offer to the Neals, the Plaza defendants successfully stalled plaintiffs' applications for zoning changes on the Evergreen Avenue property for five years. This delay ultimately forced the plaintiffs to abandon their venture. We hold that these allegations state a cause of action under the antitrust laws. The right to petition the courts for the redress of grievances does not protect abuse of the judicial process through the institution and subsidization of baseless litigation and delay

of its final resolution, solely to harass and hinder a competitor. Nothing in the First Amendment licenses the kinds of abuse of civil process that the record discloses here. We therefore reverse.

The district court's and defendants' reliance on *Miracle Mile Associates v. City of Rochester*, 617 F.2d 18 (2d Cir. 1980), and *Wilmorite, Inc. v. Eagan Real Estate, Inc.*, 454 F.Supp. 1124 (N.D.N.Y.1977), *aff'd. without opinion*, 578 F.2d 1372 (2d Cir.), *cert. denied*, 439 U.S. 983, 99 S.Ct. 573, 58 L.Ed.2d 655 (1978), is misplaced. These cases are plainly distinguishable.

In *Miracle Mile*, the City of Rochester opposed plaintiffs' plans to build a shopping center through proceedings instituted before various state and federal environmental agencies. Miracle Mile subsequently brought an action under the Sherman Act, charging that the City opposed the shopping center in bad faith and with the intent to suppress competition with commercial property owned by the City. In affirming the grant of summary judgment for the municipal defendant, the court found that the City had a "legitimate municipal interest in preserving the City from the adverse economic impact created by the suburban project," as distinguished from the "sham exception" cases "where the only motivation for resort to adjudicatory processes was the restraint or elimination of competition." 617 F.2d at 21. The State Environmental Quality Review Act, which the City invoked in the state proceedings, was intended to protect the interest of municipalities such as Rochester in preventing overdevelopment. That the City had a reasonable basis for invoking the Act was both conceded by the plaintiffs and evidenced by the City's success in the State Wetlands Proceedings. Having reasonably invoked administrative and judicial proceedings for the purpose for which they were intended, the City incurred no liability. Here, by contrast, the defendants had no reasonable basis for their appeals from the decision of

the HPZC, which appeals were taken solely for anti-competitive purposes.

In *Wilmorite*, the defendants were competing shopping center owners who instituted and sponsored litigation to prevent plaintiffs from developing a new shopping center. The resemblance to this case ends there, as the *Wilmorite* defendants "prevailed in the trial court, and were partially successful in the Appellate Division." 454 F.Supp. at 1135. This led Judge Port to state: "these are hardly the threads from which a 'pattern of baseless repetitive claims,' can be woven," *Id.* (citation omitted). Unlike the *Wilmorite* defendants, the Plaza defendants lost every appeal they took and all but one of the appeals that they sponsored. Furthermore, they engaged in misrepresentations to the court in the conduct of their appeals, as evidenced by the "purely bull" inscription on the letter to the Chief Judge of the Connecticut Supreme Court, and they failed to communicate a settlement offer to the Neals. No such improper activities occurred in *Wilmorite*.

■ Nor can the Plaza defendants derive any comfort from the Supreme Court's opinions in *N.A.A.C.P. v. Button*, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963), or *In re Primus*, 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978). Their lawyers' in person solicitation of the landowners to join in litigation against the shopping mall and their secret financing and control of that litigation were not "modes of expression and association protected by the First and Fourteenth Amendments . . . ," *Button, supra*, 371 U.S. at 428–29, 83 S.Ct. at 335, for two reasons. First, *Primus* and *Button* are concerned only with the solicitation and financing of good faith claims. Here, the Plaza defendants are alleged to have solicited numerous baseless suits by the landowners. Second, the First Amendment does not shield such improper practices in the solicitation and representation of clients as occurred here.[10] *See Primus, supra*, 436 U.S.

---

10. The Connecticut Code of Professional Responsibility adjures lawyers from advising a layman to sue "if motivated by a desire to . . . cause litigation to be brought merely to harass or injure another," Ethical Consideration ("EC") 2–3; generally prohibits lawyers who

at 426 and 439, 98 S.Ct. at 1901 and 1908; *cf. Ohralik v. Ohio State Bar Association*, 436 U.S. 447, 449, 98 S.Ct. 1912, 1915, 56 L.Ed.2d 444 (1978) (holding a state "constitutionally may discipline a lawyer for soliciting clients in person ... under circumstances likely to pose dangers that the state has a right to prevent").

█ In this regard, we note that it is relevant for the plaintiffs to show what fees the Plaza defendants paid to the lawyers for the landowner defendants in connection with the appeals from the HPZC. There is nothing confidential and privileged about the fact or amount of such payments, *see Colton v. United States*, 306 F.2d 633, 637–38 (2d Cir. 1962), and such evidence should be admitted.[11]

Reversed and remanded.

VAN GRAAFEILAND, dissenting:

Because, like Judge Eginton, I am unable to distinguish the instant case from this court's prior holdings in *Wilmorite, Inc. v. Eagan Real Estate, Inc.*, 454 F.Supp. 1124 (N.D.N.Y.1977), *aff'd mem.*, 578 F.2d 1372 (2d Cir.), *cert. denied*, 439 U.S. 983, 99 S.Ct. 573, 58 L.Ed.2d 655 (1978), and *Miracle Mile Associates v. City of Rochester*, 617 F.2d 18 (2d Cir. 1980), I respectfully dissent.

The First Amendment guarantees access to our nation's courts regardless of the plaintiff's anti-competitive motivation. Unless the plaintiff's conduct corrupts the judicial processes, *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 513, 92 S.Ct. 609, 613, 30 L.Ed.2d 642 (1972), or deprives a competitor of meaningful access to adjudicatory tribunals, *id.* at 512, 92 S.Ct. at 612, he is not in violation of the Sherman Act. *Wilmorite, Inc. v. Eagan Real Estate, Inc., supra*, 454 F.Supp. at 1131.

Sham litigation may perhaps corrupt the judicial process. However, a case in which the Connecticut Supreme Court has seen fit to grant certification can hardly be described as "sham". See *State v. Cullum*, 149 Conn. 728, 176 A.2d 587 (1961); Conn.Practice Book § 761C. This would surely seem to be true where, as in the instant case, a twelve page opinion, *Schwartz v. Town of Hamden*, 168 Conn. 8, 357 A.2d 488 (1975), and a seven page opinion, *Schwartz v. Town of Hamden*, 168 Conn. 20, 357 A.2d 496 (1975), follow the granting of review.

I do not believe that the alleged improper conduct of defendants' attorneys rose, or perhaps "fell" is a better word, to the level of such "illegal and reprehensible" practices as perjury, fraud, and bribery, so as to corrupt and make illegal the entire judicial process in which defendants were engaged. See *California Motor Transport Co. v. Trucking Unlimited, supra*, 404 U.S. at 512–13, 92 S.Ct. at 612–13. So far as appears, the administrative and judicial proceedings in Connecticut were fairly conducted. Plaintiffs had their day in court and prevailed. Plaintiffs' real complaint, one that is voiced all too often today, is that they had too many days in court. Relief from inordinate delay should have been sought in the Connecticut tribunals to which plaintiffs had ready access. While their plight merits sympathy, it does not merit invocation of the Sherman Act.

I would affirm.

█

---

volunteer advice to sue from also accepting employment in that matter, EC 2–4; and prohibits multiple representation of clients with differing interests, EC 5–15, or without full disclosure, EC 5–16.

11. In an earlier phase of this action, Judge Newman postponed decision on the plaintiffs' request for discovery of the landowners' lawyers as to the fees paid them by the Plaza defendants, pending decision of the motion for summary judgment.